LOTTINGER, Judge.
This is a suit for expropriation filed by Louisiana Power and Light Company against United Lands Company, Inc. Since the inception of this suit, same has been consolidated with two other suits, namely, Louisiana Power and Light Company v. Mercedes B. de Latour, wife of and A. P. Schiro et al., and Louisiana Power and Light Company v. Sorrento Dome Land Corporation et al., 218 So.2d 913, 912. All three suits will be considered in this opinion, however, separate judgments will be rendered in each suit.
In these consolidated matters, Louisiana Power and Light Company seeks to expropriate a servitude two hundred feet in width across lands of defendants for the erection, maintenance and operation of a 500,000 volt, or a 500 K.V. electric transmission line which will extend from Gulf States Utility Facilities in the Parish of Ascension to the petitioner’s Little Gypsy Steam Electric Generator Station in the Parish of St. Charles, Louisiana. The lands which are sought to be traversed are situated on the east bank of the Mississippi River in the Parish of Ascension and are comprised of two large tracts of about equal size, one owned by United Lands Company, and the other by Sorrento Dome Land Corporation, James H. Boyce and Claude G. Boyce, and two small tracts owned by Mrs. Mercedes B. de Latour and others. The lands comprise one contiguous tract of some 18,000 acres which are traversed by the New Orleans-Baton Rouge Airline Highway, railroad lines, pipe lines, electric lines, rural roads, canals, and the proposed Interstate 10 Highway.
The transmission line is to be equipped with “Y” aluminum towers. The single leg of these structures will rest on a grillage path some 11' x IF square by 8" in depth and will be held in place by eight guy wires attached to four anchors. The height of the cross arm of the structure will vary from 75 to 80 feet, and that of the tower proper will vary from 92 to 142 feet. The towers are to be spaced approximately 750 feet to 960 feet apart. From these towers will be suspended three phases of three conductors each, or nine cables. These cables weigh approximately one pound per foot and their minimum above ground clearance at their maximum point of sway is to be thirty-five feet.
The defendants, Mrs. Mercedes B. de La-tour and others filed an answer to petitioners’ petition and defendants, Sorrento Dome Land Corporation, et als, filed an answer and amended answer to the petition filed against them. Defendant, United Lands Company, Inc. filed dilatory exceptions of prematurity and vagueness, peremptory exceptions of no cause and no right of action as well as special defenses. Due to responses of petitioners to interrogatories filed by defendants, the exception of vagueness has been waived. As the special defenses and the exception required the presentation of evidence in support thereof, defendants’ counsel stated at the outset of the trial that these exceptions and special defenses were specifically reserved and that the record would show that the case was being tried on these exceptions as well as on the merits.
After trial on the merits, the Lower Court rendered judgment in favor of petitioners and against defendants granting the expropriation as prayed for and awarded damages for the taking in favor of United Lands Company, Inc., in the sum of $8,-594.25, in favor of Mrs. Mercedes B. de Latour and others, in the sum of $149.00, and in favor of Sorrento Dome Land Corporation, et al, in the sum of $25,909.82. No severance or consequential damages were awarded below. From this judgment, all defendants have taken this devolutive appeal.
In the Court below, the defendants objected to the failure of the petitioners to consider the change of location of the servitudes for a short distance so as to avoid *907 the passage over what is known as the Sor-rento Salt Dome, and, in the alternative, objected to the quantum offered the defendants by the petitioners. In addition to these two factors, on appeal, the defendants also alleged error on the part of the Lower Court in its failure to allow defendants consequential or severance damages in addition to damages for the taking.
Subsequent to the filing of this appeal, however, the electric transmission line was constructed by the petitioner across the right of way site, and, by way of reply brief, the defendants now simply ask for an increase in the amounts awarded by the District Court for the taking, as well as for severance or consequential damages to the remaining lands of defendants. All the area in which these lands áre located is presently experiencing substantial industrial development and growth. The record shows numerous tracts in the area on the east and west sides of the Mississippi River that have been purchased and are being used for industrial purposes.
The unique and real significant factor in these cases is the existence of what is known as the Sorrento Salt Dome lying beneath the subject property owned by the defendants. The servitudes cross this salt dome near its center or shallowest point. The uncontradicted testimony shows the need on the east side of the Mississippi River in the area between New Orleans and Baton Rouge for the underground storage of hydrocarbons and salt brine production occasioned by industrial development and the growth of petro-chemical industry in the area. It was shown that in this same area there are but three salt domes, namely, Sorrento, Darrow and Hester. It appears that by reason of its size, location and formation, the Sorrento dome is preferable to the other two.
Mr. Frank L. Keller, professor of Economics at Tulane University, testified on behalf of defendants as to the growing demands for underground storage of hydrocarbons and its economic advantages, i. e., the cost per barrel averaging forty cents to $2.00 as opposed to surface storage cost of $15.00 to $20.00 per barrel. This underground storage is effected by drilling into the salt dome structure and then leeching out cavities or “jugs” of 1,000,000 barrel or more capacity each.
The testimony shows that in the Sorrento dome area above the 8,000 foot contour there are some 3,470 acres usable for brine production or underground storage. There is also testimony to the effect that within the proposed 200 foot right of way and above the 8,000 foot contour there are thirty acres of usable salt dome area belonging to defendant Sorrento Dome Lands and twenty-five acres belonging to United Lands. At present the dome is actually being used for both salt recovery and underground storage. Leases are in existence in favor of Shell Oil Company, Humble Oil and Refining Company and Texaco, Inc., for underground storage. Kaiser Aluminum and Chemical Corporation has a brine lease affecting certain acreage on the dome.
The Lower Court correctly found that the highest and best use for the lands of the defendants situated on the Sorrento Salt Dome within the 8,000 foot contour is the sub-surface storage of hydrocarbons and the production of salt brine. They claim that, in connection with this usage, the surface use of the land is essential and indispensable, thus rendering the erection and maintenance by the petitioner of its high voltage transmission line a completely incompatible operation. Petitioners, of course, maintain that their above ground construction and operation will not interfere with the sub-surface storage operations of the defendants as the jugs could be directionally drilled.
Mr. Vincent Forte, an electrical engineer who testified on behalf of the defendants, described the dangers inherent in a transmission line of the magnitude to be constructed by petitioners and stated that he would not recommend nor permit construction of a drilling rig on the right of way or beyond the right of way at any distance *908 from the transmission line where if either fell it might strike the other. To the same effect was the testimony of Mr. Deloney and Mr. Steiner, engineers for petitioners, who stated that they would not permit the erection of a drilling rig on the right of way and would strongly recommend against the erection of a rig adjacent to the right of way near enough to a line so that it would fall onto the line or the line onto it. All parties conceded that no well could be safely drilled within 300 feet of the center line of the servitude. Therefore, if underground storage operations are necessarily maintained by surface operations constructed directly above, the two operations would, as maintained by the defendants, be completely incompatible.
Dr. William Shaw, a consulting geologist who testified on behalf of defendants, described the great potential of the Sorren-to dome for further underground storage of hydrocarbons and production of brine. He stated that the sub-surface salt strata, beginning at the top of the dome and extending to the 8,000 foot contour is suitable for creating underground storage cavities on the dome. He stated that one jug in a five acre spacing could be created in the subsurface strata or approximately 700 jugs in one level in the area. The number of available jugs could be increased by deepening to various suitable levels. A map prepared by Dr. Shaw showed the existing jugs which were being used. There were seven such cavities on the property of United Lands, Inc., located approximately one mile north of the right of way. There were three jugs on a small tract owned by Mrs. Mercedes B. de Latour, et als, on a small tract of land which is not involved in this suit. There were no jugs on the property of defendants, Sorrento Dome Lands Corporation, et al. Dr. Shaw testified that he knew of no instance in which underground storage cavities had been drilled by means of directional drilling. He stated, however, that presence on the right of way of the electrical transmission facilities would not interfere with the exploration for oil and gas by directional drilling, but that he was unable and unwilling to express an opinion as to whether the transmission facilities on the right of way would interfere with the use of the salt dome for underground storage of hydrocarbons.
Of the number of experts who testified on the trial of this matter, none of them knew of any well which had ever been directionally drilled for underground storage. They were, however, familiar with directional wells drilled for the production of oil and gas.
Mr. Thomas M. Rodgers, Jr., a consulting petroleum engineer who testified on behalf of defendants, testified that if no problems were encountered in the course of directional drilling for sub-surface storage, the actual drilling cost would increase by approximately twenty-five per cent, or between $10,000.00 and $12,000.00 per well. Mr. John O’Connor, a consulting petroleum engineer who had been engaged by petitioners to make a study as to whether or not the right of way and transmission lines would interfere with the minerals or use of salt domes for sub-surface storage, testified that there would be no problem in directionally drilling to the top of the salt dome from a point some 300 feet from the center line of the proposed right of way. He stated, however, that the additional cost of directional drilling the well would run from $6,000.00 to $10,000.00.
On rebuttal, the petitioners produced Mr. Ralph Brumly, a specialist in directional drilling. Mr. Brumly testified that he was a co-owner of the company known as Whit-stock, Inc., which specializes in directional drilling operations. He testified that in a situation such as presented here, it would be feasible from a point some 300 feet from the center line of the right of way to either explore and produce minerals or to create cavities for underground storage. He testified that in a given formation hazards such as blow-outs, pipe wear and subsidence remained the same whether the hole is vertical or deflected before reaching vertically over the intended target. The extra cost of drilling a directional well, according *909 to Mr. Brumly, was estimated at between $6,000.00 and $9,000.00.
With regard to the testimony of Mr. Brumly, the Lower Court said:
“It seems quite apparent to the Court that of the distinguished gentlemen who testified with respect to the directional drilling aspects of the case, the testimony of Mr. Brumly is far and away the most learned on the subject. It is he who is engaged daily in such drilling activities and he appeared to have a most thorough and extensive knowledge of the subjects. True it is, as contended by counsel for defendants, that he never drilled directionally for the development of an underground cavity; however, he most convincingly demonstrated to the Court how such could be done. True it is also, as pointed out by counsel for defendants, that the record shows that there never has been a hole directionally drilled for the creation of an underground cavity. While this may be true by reason of the fact that directional drilling in such cases simply has not been necessary or otherwise, the Court does not know. The Court does believe, however, which belief is primarily but not entirely bases on the testimony of Mr. Brumly, that such directional drilling can be done under the proposed right of way and transmission facilities, and that it can be done feasibly from both an economic and engineering stand-point and that the added, relatively minor cost will be borne by the lessees and not defendant landowners.”
Although we feel that the directional drilling of a storage cavity would be possible, and defendants have certainly not proved the contrary, it is shown that such directional drilling would be more costly than vertical drilling. Such a holding by the Lower Court was correct and was in accordance with the overwhelming preponderance of the evidence.
It is also true, as stated by the Lower Court, that the added cost of any directional drilling would be borne by the lessees and not the defendant landowners. However, such added cost would be of an economic disadvantage to the landowners as such would certainly be of importance in any negotiations for a lease in this area, particularly the rental terms thereof. The saleability of a lease for underground storage within 300 feet of the center-line of the servitude would not be as attractive as that of equal geological formations in an area where directional drilling would not be necessary because of the lesser cost of such a well.
From the evidence before us, however, we question the fact whether there would be any necessity for directional drilling because of the transmission line. Mr. Thomas M. Rodgers, Jr., a consulting petroleum engineer and attorney, who was a witness for defendants, testified that the minimum spacing of storage jugs would be something less than seven acres per jug. He stated that Shell Oil Company has one jug on a ten acre lease and that Texaco is constructing three jugs on a twenty acre tract which gives them a spacing of something less than seven acres per jug.
On cross-examination Mr. Rodgers testified regarding a recent agreement entered into between Esso and Texaco relative to the spacing of jugs so as to prevent communication between jugs. This agreement provided that the jugs should be spaced 400 feet apart and, the wells would be 330 feet from the common boundaries of their respective leases. This would place the wells at a distance of 660 feet apart and, assuming a barrier of 400 feet between jugs, would give each jug a maximum diameter of 260 feet. Thus using the 660 foot spacing between the wells it is certainly possible to make use of the portion of the salt dome below the servitude for storage cavities without the necessity of directional drilling.
It is, therefore, the opinion of this Court that the transmission line will not interfere with the drilling of jugs beneath the 200 foot servitude, nor with the 300 *910 foot restricted areas to each side of the center-line of the transmission line, and that jugs can be drilled without the necessity of directional drilling. As a consequence we find no severance damages to the land adjoining the servitude.
Now with regard to damages for the taking, the Lower Court said:
“Mr. Kermit Williams, expert appraiser who testified on behalf of defendants, categorized, the property within the right of way area as (1) salt dome land, (2) high land, and (3) wet land. Using figures introduced by Mr. Thomas Rodgers, a petroleum engineer who testified on behalf of defendants, he placed a value of $15,654 per acre on the salt dome land. The high land he appraised at $400 per acre and the wet land at $200 per acre. He found no severance damage to land in the latter two classifications.
Mr. J. Russell Doiron, the other real estate expert who testified on behalf of defendants, used a classification of the properties similar to that of Mr. Williams. He placed a value of $11,687 per acre on the salt dome land, $400 per acre on the high land and $250 per acre on the wet land. He likewise found no severance damage to the latter two categories.
Believing that the construction and maintenance of the proposed power line and right of way will in no way interfere with the production of brine and underground storage of hydrocarbons, the Court can see no basis for a separate classification of salt dome land as used by Messrs. Williams and Doiron. After analyzing the testimony of all experts, the Court finds itself most impressed by that of Mr. E. A. Tharpe, who testified for plaintiff. This gentleman viewed the property from a helicopter and traversed it on foot. His appraisal is most thorough and painstaking and, the Court believes, gives as accurate an estimate of defendants’ damages as is possible to ascertain. It is summarized in plaintiff’s brief as follows:
‘Sorrento Dome Land Corporation, et al.:
1. Division “A”: 200 feet wide between the westerly boundary and the Conway Canal being high-type swampland or wooded land, subject to standing water from rainfall inundation, and containing 25.18 acres at $400 per acre x 50%, or $5,036. Mr. Tharpe believes this property would enjoy the influence of speculation on the open market. He stated that the interim highest and best use is for hunting and trapping, or cattle grazing. He stated that when he was on the property he did notice cattle present.
2. Division “B”: 200 feet in width between the Conway Canal and the railroad right of way consisting of the same type of land as in Division “A”, but a little more accessible, and containing 13.65 acres at $450 per acre x 50% or $3,071.25. Mr. Tharpe found the same highest and best use for this property as he did for the Division “A”.
3. Division “C”: 200 feet in width between the railroad track and Airline Highway consisting of the same type of land as in Division “B”, but much more accessible, and containing 5.16 acres at $1,250 per acre x 75% or $4,837.50. Mr. Tharpe found this property has potential for commercial purposes, taking into account of an informed purchaser having knowledge of the proposed interchange for U. S. Highway I — 10, as shown on map P-4.
4. Division “D”: 200 feet in width between the Airline Highway and the private road in Section 21, located a short distance east of the crayfish pond, containing 10.34 acres at $900 per acre x 75%, or $6,979.50. This property is the same type of land as Division “C”, but is not as accessible because of borrow pit or ditch next to the Highway. Mr. Tharpe believes this property has potential for commercial purposes or rural residential or camp site development.
5. Division “E”: 200 feet in width beginning at the private road and extending easterly to a depth of 1,500 feet containing *911 6.89 acres at $450 per acre x 75%, or $2,-325.37. In Mr. Tharpe’s opinion the market would reflect some speculation influence on this property for rural, residential or camp site development.
6. Division “F”: 200 feet in width beginning at the east end of Division “E” and extending in an easterly direction to the easterly boundary line, which consists of wet swampland and contains 19.05 acres at $300 per acre x 50%, or $2,857.50. This property is lower swampland than those contained in the other Divisions above, but Mr. Tharpe reflects in his appraisal the influence of the proposed U. S. Highway 1-10.
The total acreage within the right of way across Sorrento Dome Land Corporation, et al. is 80.27 acres for a total price of $25,107.12, or an average price per acre of $313.14 based on Mr. Tharpe’s appraisal.
United Lands Company, Inc.:
1. Division “A”: 200 feet in width between the westerly boundary line and the private road in Section 22, containing 11.46 acres, $300 per acre x 75%, or $2,353.50. Mr. Tharpe’s classification of this property lies between his classifications of Divisions “E” and “F” on the property of Sorrento Dome Land Corporation, et al.
2. Division “B”: 200 feet in width between the private road in Section 22 and the east edge of the McElroy ridge containing 11.94 acres at $350 per acre x 75%, or $3,134.25. Mr. Tharpe took color photograph P-81 of a hunting lodge on the ridge. This property is higher and dryer than the classification of Division “F” by Mr. Tharpe on the property of Sorrento Dome Land Corporation, et al.
3. Division “C”: 200 feet in width between the east edge of the McElroy ridge and the easterly boundary line consisting of wet swampland and containing 41.42 acres at $150 per acre x 50%, or $3,106.50. Mr. Tharpe testified that he found the swampland in this area very low with standing water hip-deep. He testified that the highest and best use of this property, presently and in the foreseeable future, is hunting and trapping.
The total acreage within the right of way across the property of United Lands Company, Inc., is 64.82 acres for a total price of $8,594.25, or an average price per acre of $132.57 based on Mr. Tharpe’s appraisal.
Mr. Tharpe found the area of the right of way across the parcels of land owned by Mrs. Mercedes B. de Latour, et al. In Section 24 to be the same type of land involved in his classification of Division “C” on the property of United Lands Company, Inc. The total area within the right of way across these two parcels or tracts is 1.99 acres which Mr. Tharpe appraised at $150 per acre x 50%, or $149 ($75.00 per acre).
Mr. Tharpe did not make any deductions for the existing rights of way for pipelines, electric lines, telephone lines, railroad track, highway, roads, canals, or borrow pits which cross the proposed right of way, as shown on map P-4.
Mr. Tharpe considered the question of whether the remaining areas of the subject properties would have severance or consequential damages after the taking of the right of way, and he testified that in his opinion there would be no such damages or diminution in value to the remaining properties, because the landowners will retain the same uses of the remaining lands after the taking that they had before the taking of the right of way.’
Mr. Murray Brashers, consultant forester and timber appraiser, placed a value of $10.00 per acre on the timber land in the proposed right of way over land of Sor-rento Dome Land Corporation, et al, and this defendant should receive the sum of $802.70 for timber loss. No trees of commercial value were found on the other properties.”
In determining the market value of a servitude, the landowner is entitled to be compensated only to the extent of the *912 estate taken. In these cases landowners will retain many uses within the area of the right of way such as cavities for the storage of petroleum products, grazing of cattle, construction of roadways, and all other such uses which are not in conflict with the right of way. As they are retaining their right of storage which is the highest and best use of the property situated on the salt dome, they are not entitled to be compensated for such loss. We, therefore, find no error in the acceptance by the Lower Court of the appraisal as submitted by Mr. Tharpe, and his appraisal, when considered with that of defendants’ appraisers, Messrs. Williams and Doiron, seems to be reasonable.
For the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed. All costs of this appeal to be paid by defendants.
Judgment affirmed.