228 So.2d 140

**LOUISIANA POWER & LIGHT COMPANY**

v.

**UNITED LANDS COMPANY, Inc.**

**LOUISIANA POWER & LIGHT COMPANY**

v.

**Mrs. Mercedes B. de LATOUR et al.**

**LOUISIANA POWER & LIGHT COMPANY**

v.

**SORRENTO DOME LAND CORPORATION et al.**

No. 49627.

Nov. 10, 1969.

William H. McClendon, Jr., Metairie, Paul G. Barron, Jr., Plaquemine, Robert P. Breazeale, Baton Rouge, Connolly, Connolly & Labranche, New Orleans, for defendants, appellants and applicants.

Monroe & Lemann, Andrew P. Carter, Melvin I. Schwartzman, Eugene G. Taggart, W. Malcolm Stevenson, New Orleans, Blum, Talbot, Sotile & Carmouche, Vincent J. Sotile, Donaldsonville, for plaintiff-respondent.

BARHAM, Justice.

We granted writs to review the Court of Appeal decisions which affirmed the trial court judgments granting servitudes by expropriation to the plaintiff over the lands of the several defendants and awarding compensation for the servitude but denying severance damages.[1]

The Court of Appeal's opinion, 218 So.2d 905, 906, describes the servitude and the lands involved as follows:

"In these consolidated matters, Louisiana Power and Light Company seeks to expropriate a servitude two hundred feet in width across lands of defendants for the erection, maintenance and operation of a 500,000 volt, or a 500 K.V. electric transmission line which will extend from Gulf States Utility Facilities in the Parish of

---

1. These three expropriation suits were consolidated for the purpose of trial, but individual judgments were rendered both in the trial court and in the appellate court. See Louisiana Power & Light Co. v. United Lands Co., Inc., 218 So.2d 905; Louisiana Power & Light Co. v. Mercedes B. de Latour et al., 218 So.2d 913; and Louisiana Power & Light Co. v. Sorrento Dome Land Corporation et al., 218 So. 2d 912. Although our opinion will apply to the servitudes on the properties of the various defendants in these cases, we will use the singular form "servitude" for clarity.

Ascension to the petitioner's Little Gypsy Steam Electric Generator Station in the Parish of St. Charles, Louisiana. The lands which are sought to be traversed are situated on the east bank of the Mississippi River in the Parish of Ascension and are comprised of two large tracts of about equal size, one owned by United Lands Company, and the other by Sorrento Dome Land Corporation, James H. Boyce and Claude G. Boyce, and two small tracts owned by Mrs. Mercedes B. de Latour and others. The lands comprise one contiguous tract of some 18,000 acres which are traversed by the New Orleans-Baton Rouge Airline Highway, railroad lines, pipe lines, electric lines, rural roads, canals, and the proposed Interstate 10 Highway.

"The transmission line is to be equipped with 'Y' aluminum towers. The single leg of these structures will rest on a grillage path some 11' x 11' square by 8" in depth and will be held in place by eight guy wires attached to four anchors. The height of the cross arm of the structure will vary from 75 to 80 feet, and that of the tower proper will vary from 92 to 142 feet. The towers are to be spaced approximately 750 feet to 960 feet apart. From these towers will be suspended three phases of three conductors each, or nine cables. These cables weigh approximately one pound per foot and their minimum above ground clearance at their maximum point of sway is to be thirty-five feet."

The proposed servitude crosses a portion of the Sorrento Salt Dome, which was formed by intrusion of a salt mass into a preexisting formation. The contour of the salt formation is generally circular on the horizontal and conical on the vertical. At the center of the mass the top of the salt formation is only 2000 feet below the surface. The top of the salt mass is to a large degree uniform in its circular regression as it recedes from the center for a distance of approximately one mile, at which point it is 8000 feet below the surface. Although there is limited knowledge of the qualities and characteristics of this formation, the consensus of the experts is that the dome from its center to its 8000-foot contour (an area of five and one-half square miles) may be valuable both for the production of brine and for the storage of hydrocarbons. The Sorrento Salt Dome is considered by experts to be an excellent facility for underground storage because of the proximity of a large portion of the formation to the surface, the depth or thickness of the salt mass, and the large surface area under which it is spread.

To utilize the subsurface for the extraction of brine and the creation of storage facilities a well similar to the usual oil or gas well is drilled so as to penetrate the salt formation. Water is forced into the formation through the well, the salt is withdrawn as brine, and a cavity is left in the salt mass because of gradual dissolving

of the salt and a resulting erosion by the leaching process. The jugshaped cavity, or "jug", formed by this leaching is used for the storage of hydrocarbons. A jug is 100 feet or more in diameter and 1000 feet or more in depth, with capacity for storing over a million barrels of one of the various hydrocarbons. A thick barrier of salt must be retained around each jug to form a satisfactory wall for the containment of the stored product.

Ten such jugs were in use or under construction in the 10 years preceding trial under then existing leases, generally near the center or uppermost portion of the dome. It is accepted that costs for production in the salt mass nearest the surface are less, and also that the center of the dome provides a capacity for more jugs because of the depth of the formation itself and the possibility of "layering" the jugs. The Court of Appeal opinion adopts the argument of defense counsel that the servitude crosses this salt formation near its center where it is closest to the surface; however, both plaintiff's and defendants' experts actually located the servitude in their testimony and on their exhibits about one-half mile from the center of the formation or one-half the distance from the center of the formation to the outer rim of its 8000-foot contour. The servitude passes at one point over the salt formation at a contour of approximately 3700 feet, but the great length of the servitude across the formation is between the contours of 5000 and 8000 feet.

The defendants' principal contention is that the servitude where it crosses the Sorrento Salt Dome will deprive them of the valuable subsurface rights and benefits of producing brine and storing hydrocarbons below the servitude and the immediately adjacent land.

■ It is argued by some of counsel, and the Court of Appeal twice comments in its opinion, that the highest and best use of the property "situated on the salt dome" was for the subsurface production of brine and storage of hydrocarbons. However, the Court of Appeal must have been adverting to subsurface and mineral rights and not to the surface servitude, for when it fixed just compensation, it assigned hunting, trapping, cattle-grazing, commercial purposes, residential purposes, and camp-site development (all surface uses and rights) as the highest and best uses for various parcels of land over which the servitude passes, including those above the salt dome. The plaintiff here has expropriated only a servitude over defendants' lands and has acquired no title affecting the minerals. We are of the opinion that the subsurface rights of these defendants are to be considered as and if they are affected or damaged by severance and not as an element of just compensation. Since the serious difference between the parties

arises in the dispute over the subsurface rights and values, we will defer consideration of just compensation for the servitude.

So that areas adjacent to each other in the salt formation may be used for storage of different hydrocarbons, the containing wall around each jug, or the "buffer zone" between jugs, must be of a sufficient thickness to prevent leakage through fissures or otherwise into an adjacent storage cavity. Defendants contend that their experts, a geologist and a petroleum engineer, have established that only 200 feet of salt must be retained as a buffer zone between adjacent jugs, and that no jug will exceed 100 feet in diameter. They then conclude that only 300 feet need separate each well from others, or that each jug requires only 300-foot spacing, or about two and one-quarter acres.

Admittedly no well can be drilled upon the 200-foot right of way. According to defendants' contention and a statement by the Court of Appeal, all parties concede that no well could be safely drilled within 300 feet of the center line of the servitude —that is, within 200 feet of its exterior limits. We have failed to find such a concession or agreement; however, for the purposes of this opinion we will accept as a matter of fact that drilling should not occur within 300 feet of the center line of the servitude. Upon the basis that no well may be drilled within 300 feet of the cen-

ter line (or the corollary that wells on opposite sides of the servitude would be 600 feet apart) and upon defendants' interpretation of the testimony of their experts that the wells need be only 300 feet apart, defendants project the conclusion that they are totally deprived of the use of 300 feet of subsurface for storage.

Although this writ was granted for consideration of what we believed to be errors of law, in our study of the entire record and the appellate court opinion we have discovered primarily questions of fact. This requires us to make an independent conclusion of fact in this case, and we have done so after a thorough examination of the testimony covering eight days, the several volumes of exhibits, and the extensive pleadings and briefs. The difficult question in this case is whether the exercise of the servitude will deprive defendants of effective access to the subsurface area so as to cause a loss to defendants in subsurface rights and lease revenues.

According to all of the expert testimony, underground storage of hydrocarbons is new and undeveloped. Although 10 cavities had been developed or were in process of development in the vicinity of the subject property, the courts have been afforded no expert testimony from anyone with firsthand knowledge or field experience in drilling, utilizing, or maintaining underground storage facilities. The defense

used an economist, as well as other witnesses both expert and lay, to project the economic growth and development which might be expected in the area of the servitude and to project the future value of the subsurface rights in the salt formation below the servitude.

At the time of trial only a fraction of the entire salt formation was under lease for extraction of brine or for underground storage, and these leases had not been developed to their full capacity. Three witnesses offered by the defendants agreed that it is most economical to store hydrocarbons under ground, but differed considerably in their estimate of cost per barrel for such underground storage. The petroleum engineer assigned the per-barrel cost at from 50¢ to $2.50, the economist fixed the cost at from 40¢ to $2.00, and an employee of one of the lessees of underground storage gave the cost at from 50¢ to $1.00. Even greater divergence and speculation appear in the testimony regarding other economic factors affecting, as well as economic benefits resulting from, the subsurface storage of hydrocarbons.

Much of the expert testimony on both sides concerns the feasibility and cost of directional drilling for utilizing the subsurface beneath the servitude. The Court of Appeal concluded, as did the trial court, that directional drilling may fully tap the resources of the subsurface strata and is feasible from both an economic and an engineering standpoint. The appellate court disagreed with the trial court's finding that any additional cost for directional drilling would be reflected only in the lessees' interests and that there would be no economic disadvantage to the landowners.

The appellate court's final holding disregarded the question of directional drilling. The court concluded that the wells, or centers of the jugs, should be 660 feet apart, and that the buffer zone between jugs should be 400 feet. Under this finding the Court of Appeal held that the usual and ordinary method of vertical drilling with the wellhead located 300 feet from the center line of the servitude could form jugs so as to utilize fully the subsurface rights of the defendants under the servitude and the land immediately adjacent, and that defendants had therefore suffered no severance damages.

We conclude, as did the trial court and the Court of Appeal, that directional drilling for the utilization of all of the subsurface rights for storage is feasible and practical. It was the opinion of all who were knowledgeable in the field that no well is perfectly vertical, and that leases generally provide for deviation of up to 2° or 3° from the vertical. The shallowest well which could be drilled along the servitude would penetrate the top of a proposed jug at approximately 4000 feet. A lessee could remain within a 3° deviation in drill-

ing an *intended vertical* well, and upon entering the top of such a proposed jug could have veered more than 200 feet from the vertical. (The court recognizes that while the ideal vertical is seldom if ever achieved, it is desirable, and that most deviations are corrected so that wells tend to spiral around the vertical.) Directional drilling is a much used and technically sound method of *intentionally deviating* the drill stem from the vertical to control the well to its final bottom hole at a predetermined subsurface location. We find the testimony convincing that directional drilling from the vertical and back to the vertical for entrance into a proposed jug could be accomplished in all of the subsurface under the servitude from well sites located far in excess of the 300 feet from the center line of the servitude required here.

■ If we were to turn the opinion only upon the requirement of directional drilling and its additional cost, defendants would be faced with our further conclusion that they have not discharged their burden of proving that any additional cost would be borne by them as landowners. In fact, their own expert admitted that at the figure of $10,000.00 additional cost per well, which would certainly be a reasonable estimate of additional cost, the increased cost per barrel for storage would be only a penny. It becomes absurd to attempt to award damages to the landowners on the basis of the extra cost of one penny per barrel per

well when defendants' own witnesses vary 10¢ per barrel as to minimum and $1.50 per barrel as to maximum cost for producing a subsurface jug. The penny gets lost in discrepancies, confusion, and conjecture. Furthermore, there is no convincing evidence that such additional cost would adversely affect the landowners in effectuating leases. We would conclude that defendants have failed to prove any financial loss in the utilization of their subsurface rights even if their lessees were required to resort to directional drilling. Our law is well settled that when depreciated market value is used as the measure of severance damages, defendants must establish the actual diminution in the market value of the remainder *as of the time of trial.* Speculation or conjecture may not be used as a criterion for assigning severance damages.

■ We have found that directional drilling is feasible, and that defendants have failed to establish any loss if such a method were used. But we find, as did the Court of Appeal, that this question may be disregarded, for the evidence establishes as a matter of fact that the subsurface rights can be fully exploited by vertical drilling.

The geologists and the petroleum engineer who testified as experts for defendants stated that if necessary, a 200- to 300-foot buffer zone of salt between adjacent jugs would be sufficient. This was

their conclusion of a minimal requirement which they offered the courts without divulging any data, study, or history for its support. These same experts were also of the opinion that 500-foot, or approximately five-acre, spacing for each jug would be reasonable. They concluded that a 400-foot buffer zone between the jug walls was also reasonable—a conclusion which must have been based on the assumption that in 500-foot spacing no jug would exceed 100 feet in diameter. The record, however, does not support a finding that only 100-foot jugs were then in use or might be used for the storage of hydrocarbons. To the contrary, defendants' experts and others testified that the existing jugs had been and would continue to be expanded in diameter, and that future demand might require larger jugs.

According to the testimony, Texaco was constructing three jugs under 20 acres of surface lease, Shell had one jug under 10 acres, and Humble had six jugs beneath 100 acres and proposed nine additional jugs on this 100-acre lease. There is no evidence as to the location of the jugs on these leases. We do not know whether they were adjacent to each other on the horizonatal or "layered". We are not informed how far they were removed from each other within the area of the individual leases, or what buffer zones were utilized within the leases. The experts' con-

jecture of spacing was based upon their limited knowledge of the development and was no more than simple arithmetic projections that if 20 acres contained three jugs, the jugs must be located on a spacing of "a little less than seven acres", or that if one was located upon 10 acres, there was a spacing of 10 acres, or that if the six then in existence and the projected nine such additional jugs were placed upon 100 acres, 15 into 100 would give a spacing of a little less than seven acres per jug. In all the testimony there is not one definitive statement as to the actual spacing used in this new and still experimental development by those who were actively engaged in the industry in the vicinity of the subject property.

The Court of Appeal finally concluded that the subsurface could be utilized for storage by the drilling of wells 660 feet apart with a retention of 400 feet of salt as a buffer zone between the jugs. Defendants argue that there is no foundation for this finding, and that the Court of Appeal reached this conclusion solely on the basis of a stipulation of lessees in one contract for the protection of the common boundaries of their leases. We do not agree with this argument. Indeed, because of the lack of other information, fact, data, and history in the testimony offered by the experts to support their opinions and the ensuing difficulty of evaluating the opin-

ions, we agree with the Court of Appeal's conclusion. The leases then in existence for the purpose of tapping the subsurface for storage of hydrocarbons were discussed in the experts' testimony, and the record contains, as exhibits filed in evidence in support of their testimony and opinions, the contracts of lease and other agreements affecting the leases.

The only conclusion that can be reached from the testimony of the expert witnesses and from the exhibits offered in support of their opinions is that the industry at the time of trial required a 660-foot distance between wells and a 400-foot buffer zone between jugs. All leases and agreements among those operating or expecting to operate subsurface storage units in this salt formation contain these same minimal requirements as they affect the common boundaries and the operations of the leases. Texaco, Humble, and Shell, which then had storage facilities on their leases, and other lessees stipulated by lease or other contract that the contracting parties would neither drill within 330 feet of the common boundaries of their leases nor allow the jug or container formed by the well to come within more than 200 feet of the common boundary. Thus by agreement these wells along common boundaries of operation must be 660 feet apart and the jugs must be separated by 400 feet of the salt formation.

The expert witnesses agreed that these stipulations and restrictions were intended to protect the parties in their storage of hydrocarbons in the jugs on their respective leases. There is no better evidence in the record than this testimony and its factual foundation. The opinion that in an ideal salt formation with no fissures or other defects it would be possible to reduce these limitations and restrictions cannot prevail in the face of the overwhelming evidence of the industry's actual requirements at the time of trial. Conjecture of a possible future ideal is not a basis for assigning loss or severance damages.

The contract stipulations between the parties operating in this field are not, in and of themselves, permitted to define for the court the proper criterion for assessing its judgment. However, they become important as data and information when reflected in and translated by expert testimony, and are supportive of expert opinion. The basic test in judging the weight and sufficiency of expert or opinion testimony is the same as is commonly applied in the evaluation of ordinary evidence. The opinions of experts are to be weighed in correlation with all the facts and circumstances of the case. Opinion testimony does not replace the judgment of the court but is useful in reflecting the special knowledge of the witnesses in regard to the matters about which they testify. The validity of expert testimony must be tested in light of

the facts upon which such opinions and conclusions are founded.

The defendants have failed to establish that they have suffered severance damages to their subsurface rights as a consequence of the servitude acquired by the plaintiff.

We have previously stated that the servitude here acquired is not a taking or expropriating of the defendants' mineral and other subsurface rights including the right to remove brine and to store hydrocarbons. Just compensation for the servitude is to be based upon the highest and best use of the property expropriated. The Court of Appeal adopted the trial court's assignment of highest and best use of the land traversed by different portions of the servitude, the various per-acre valuations, and the percentages of value affected by the taking. We adopt the conclusions of the trial court and the Court of Appeal in these respects and in the award of just compensation.

For the reasons given above the judgments of the trial court and the Court of Appeal are affirmed in these three consolidated cases: Louisiana Power & Light Company v. United Lands Company, Inc.; Louisiana Power & Light Company v. Mrs. Mercedes B. de Latour et al.; and Louisiana Power & Light Company v. Sorrento Dome Land Corporation et al. Costs in this court are to be paid by the defendants in each case.