UNITED STATES of America

v.

43.42 ACRES OF LAND, etc.

Civ. A. No. 791022.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Aug. 26, 1981.

D. H. Perkins, Jr., Shreveport, La., for plaintiff.

Michael Cavanaugh, Cavanaugh & Cavanaugh, Baton Rouge, La., James J. Cox, Cox & Cox, Lake Charles, La., for defendant.

OPINION

VERON, District Judge.

This is a civil action arising under the Act of Congress approved February 26, 1931 (46 Stat. 1421, 40 U.S.C. § 258a) and acts supplementary thereto and amendatory thereof, and under further authority of the Acts of Congress approved August 1, 1888 (25

Stat. 357, 40 U.S.C. § 257), and the Act of Congress approved December 22, 1975 (Public Law 94–163; 89 Stat. 871) entitled the Energy Policy and Conservation Act, which authorizes the acquisition of land for Strategic Petroleum Reserve and related facilities, as modified by the Act of Congress approved August 4, 1977 (Public Law 95–91; 91 Stat. 565), and the Acts of Congress approved June 1, 1976 (Public Law 94–303) and July 31, 1976 (Public Law 94–373), which acts made funds available for such purposes.

In the early 1970's, sheiks of the oil-rich countries of the Middle East made certain policy decisions regarding the price for which their most precious commodity would be sold, and to whom the privilege of buying such commodity would be accorded. Although these eastern potentates no doubt expected the impact of their decisions to be far-reaching, not even the most astute of them could have expected his actions to affect the title to land in the remote marshes of Cameron Parish, Louisiana. Nonetheless, because of the energy crisis precipitated by the Arab oil embargo, and the resultant desire of the United States government to obtain storage areas for American reserves of crude oil, this court is now called upon to enter a heretofore unchartered sea in the realm of property and mineral rights. However, the master of this court does not hesitate to chart a course on this unknown sea because he has the experienced masters of the appellate courts who will correct any navigational errors.

There are areas of land in Cameron Parish known as the Hackberry salt dome, which contain large subsurface deposits of salt. The government has expropriated certain of these areas for purposes of creating underground reservoirs for the storage of crude oil.[1] The process by which such reservoirs are created was ably described by Justice Barham in the case of *Louisiana Power and Light Co. v. United Lands Co.,* 254 La. 885, 228 So.2d 140, at p. 142 (1969):

> To utilize the subsurface for the extraction of brine and the creation of storage facilities a well similar to the usual oil or gas well is drilled so as to penetrate the salt formation. Water is forced into the formation through the well, the salt is withdrawn as brine, and a cavity is left in the salt mass because of gradual dissolving of the salt and a resulting erosion by the leaching process. The jugshaped cavity, or 'jug' formed by this leaching is used for the storage of hydrocarbons. A jug is 100 feet or more in diameter and 1000 feet or more in depth, with capacity for storing over a million barrels of one of the various hydrocarbons. A thick barrier of salt must be retained around each jug to form a satisfactory wall for the containment of the stored product.

Around the time that the Arab sheiks were making the momentous decisions mentioned earlier, the land in question in this case was conveyed from the Barbe heirs to the Hamiltons. The Barbes reserved all mineral rights in the land in the act of sale.[2] The United States has deposited certain funds in the registry of the court to compensate the Barbe heirs and the Hamiltons for the value of their respective interests. Simply stated, the issue to be decided by this court is: who is entitled to be compensated for the value of the hole in the ground to be created by construction of the underground storage cavern—the land owners of the mineral owners?[3] The question is completely res nova in Louisiana law.

---

1. The Fifth Amendment to the United States Constitution guarantees the owners of the land just compensation for the taking by the government. This case arose when the Hamiltons filed a motion to amend the ownership judgment, to resolve the issue of storage rights.

2. The conveyance occurred in 1970. Although the Louisiana Mineral Code was not enacted until 1974, it would seem that the provisions of the Code most pertinent to this case (in particular, La.R.S. 31:5) approximate the state of the law prior to their enactment. *See,* Comment to La.R.S. 31:5.

3. Because of its special adaptability for purposes of underground storage, the land in question has an enhanced value, as discussed by the court in *Mid-Louisiana Gas Company v. Sanchez,* La.App. 280 So.2d 406, at pp. 411–412:

> While Meltzer's replacement theory is not the accepted method of determining market

As counsel for both parties concede, the issue must ultimately be resolved by an analysis of Louisiana law. Louisiana Civil Code Article 477 provides:

Ownership is the right that confers on a person direct, immediate, and exclusive authority over a thing. The owner of a thing may use, enjoy, and dispose of it within the limits and under the conditions established by law.

Further, Louisiana Civil Code 478 provides in part:

The right of ownership may be subject to a resolutory condition, and it may be burdened with a real right in favor of another person as allowed by law.

Finally, Louisiana Civil Code Article 490 states:

Unless otherwise provided by law, the ownership of a tract of land carries with it the ownership of everything that is directly above or under it.

The owner may make works on, above, or below the land as he pleases, and draw all the advantages that accrue from them, unless he is restrained by law or by rights of others.

In this situation, the Hamiltons are the owners of the expropriated land, but their ownership is burdened by a mineral servitude in favor of the Barbe heirs. As owners of a mineral servitude, the Barbe heirs own the right to explore for and remove the minerals on the land.

A mineral servitude is the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership.

La.R.S. 31:21.

■ This right to explore for and produce minerals includes the right to explore for and produce the salt beneath the ground, since salt is considered a mineral. *State v. Jefferson Island Salt Mining Co.,* 163 So. 145, 183 La. 304 (La.1935).[4] However, the determination that the Barbe heirs own the right to remove the salt from the subsurface strata does not necessarily lead to a finding that the Barbe heirs are entitled to compensation for the value of the cavern which is to be created after the salt is removed.

Counsel for both the Hamiltons and the Barbes direct the court's attention to cases from other jurisdictions. These cases address the question of the correlative rights of land owner and mineral owner when a different type of storage process is used, i. e., the storage of natural gas by injection of such gas into a depleted field. The gas is later withdrawn from the field as needed. Both sides hope to draw support for their claims of ownership of the salt cavern by analogy to the conflicting holdings of these cases.[5]

---

value under LSA–R.S. 19:9, *nevertheless, evidence of value of materials or deposits on condemned land is admissible in establishing market value, though not in itself a yardstick of just compensation.* State Through Department of Highways v. Hayward, 243 La. 1036, 150 So.2d 6 (1963). Therefore, in the instant case, evidence of the replacement value of the cushion gas is admissible though it is not the only standard for establishing market value as suggested by defendants. Furthermore, the Louisiana Supreme Court in the early case of *Orleans & J. Ry. Co. v. Jefferson & L. P. Ry. Co.,* 51 La.Ann. 1605, 26 So. 278, at page 284 (1899) recognized that *if the property is exceptionally adapted and available for such use, the owner may be entitled to any enhanced value due to its adaptability for valuable uses.* (emphasis added).

**4.** The court awarded damages to the State because the defendants had trespassed on state

property and "(removed) valuable minerals therefrom." The only mineral in question was salt.

**5.** The Barbe heirs direct the court's attention to two Kentucky cases, *Hammonds v. Central Kentucky Natural Gas Co.,* 255 Ky. 685, 75 S.W.2d 204 (Ky.App. 1934) and *Central Kentucky Natural Gas Co. v. Smallwood,* 252 S.W.2d 866 (Ky.App.1952). Counsel for the Barbe heirs also cite a discussion of these cases and others in an article by Alan Stamm entitled, *Legal Problems in the Underground Storage of Natural Gas,* found in Vol. 36 of the *Texas Law Review,* at page 161.

Conflicting results were reached in the cases cited by the Hamilton heirs, most notably *Ellis v. Arkansas-Louisiana Gas Co.,* 450 F.Supp. 412 (E.D.Okl. 1978), *Emeny v. United States,* 412 F.2d 1319, 188 Ct.Cl. 1024 (1969), and *Lone Star Gas Company v. Murchison,* 353 S.W.2d 870 (Tex.Civ.App., 1962). A very enlightening

However, it is the opinion of this court that the factual setting in which these cases arose renders them inapposite to the instant case. The holdings of these cases are based on a determination of whether or not the withdrawal of the injected gas by a storage company amounts to an impingement on the exclusive right of the mineral owner to explore for and capture gas on the lands in question.[6] One unreported case also held for the mineral owner on the theory that it could not be ascertained whether all the native gas in the well had actually been depleted before the injection of gas from other sources.[7] When crude oil is stored in a salt cavern, however, it should no longer be considered a fugacious mineral. It remains confined within the limits of the salt cavern to the same extent it would if stored in a tank above the ground. By withdrawing the crude oil from the cavern, the United States cannot be said to be exercising any right to explore for and produce miner-

als on the land in question; the minerals are confined within a readily ascertainable area until withdrawn as needed.[8]

The court finds that the facts presented by this case are more closely analogous to the general rule in common law states which provides that, after the removal of minerals, the opening left by the mining operations belongs to the land owner by operation of law.[9]

Louisiana has adopted a "non-ownership" theory of mineral rights.[10] The mineral in question in this case, salt, is a solid mineral. Article 5 of the Mineral Code provides:

> Ownership of the land includes all minerals occurring naturally in a solid state. Solid minerals are insusceptible of ownership apart from the land until reduced to possession.

■ Minerals, in their natural state, cannot be "owned" separately from the land.[11] Neither the Hamiltons nor the

discussion of these cases was given by Professor Thomas A. Harrell in an article in the *Thirtieth Annual Institute on Oil and Gas Law Taxation*, p. 314, et seq.

6. The court (in the *Smallwood* case) found it unnecessary to determine whether the cavern or strata from which a mineral has been removed becomes the property of the mineral or surface owner since in the case of oil and gas "the geological formations or strata common to this class of minerals may be exhausted a thousand times and the mineral owner still retains the exclusive right to take all the minerals which find their way into the formation, whether through injection or in any other way." Donley, "Use of the Containing Space after the Removal of Subsurface Minerals," 55 W.Va.L. Q.R. 202, 214 (1953), submits that this case "does not necessarily hold that in all cases the mere use of a subsurface stratum for gas storage constitutes a continuing trespass thereto which a court of equity will enjoin, and which will entitle the owner to an accounting for use and occupancy; not that it is a trespass of any kind. It is the use of the surface and other overlying strata for *injection* purposes which creates the cause of action and the grounds for equitable relief." Also, in the *Lone Star Gas Co.* case, *supra*, the court stated that the rule of capture in Texas must be limited to the original capture of gas; that rule was said to have no application to gas which had been captured and subsequently released. I Williams and Meyers, *Oil and Gas Law* Sec. 222 (1964, Rev.Dec.1980), p. 324.2 et seq.

7. *United Fuel Gas v. Brown*, 5th Judicial Circuit, Roane County, W.Va. *Report of the Legal Committee*, 10 Interstate Oil Compact Quarterly Bulletin Nos. 3 and 4, 39, 41 (Dec.1951); *Comment, Condemnation of Depleted Underground Reservoirs for Gas Storage Areas*, 15 Ohio St.L.J. 199 (1954).

8. 228 So.2d 140, 142.

9. "It has been suggested that the courts might be able to solve the problem by analogizing it to the cases of ownership of a cavern from which all the solid minerals have been removed. In such instances, the English courts have held that the mineral grantee is entitled to the exclusive use of the space, even after the solid minerals have all been wholly removed. Although the English rule has apparently been adopted in at least one United States jurisdiction, the general American rule seems to be that the shell or space in which a mineral is originally encased becomes the property of the surface owner by operation of law after all the mineral has been taken therefrom." Stamm, *supra*, at p. 168. *See also*, Mines and Minerals, 54 Am Jur.Sec. 204 (1971); Mines and Minerals, 58 C.J.S. Sec. 162 (1948).

10. *Frost-Johnson Lumber Co. v. Stalling's Heirs*, 150 La. 756, 91 So. 207 (1922).

11. 91 So. 207.

Barbes are the owners of the salt in the ground. Further, whether a state is governed by an "ownership" or a "non-ownership" theory of mineral rights, the mineral owner cannot be considered to have ownership of the subsurface strata containing the spaces where the minerals are found.[12]

A simple hypothetical may provide useful analogy. Suppose the owner of a mineral servitude begins production of salt on a certain tract of land. The field is depleted, and minerals are no longer being produced in commercial quantities. Ten years after production ceases, the mineral owner's rights have prescribed. He now has no further rights in or to the land in question. It would surely be absurd for the mineral owner to then assert that he has acquired certain rights to the hole in the ground made by his mining operations.[13]

 Therefore, for the foregoing reasons, the Barbe heirs, as owners of a mineral servitude, have no right to claim compensation for the value of the cavern to be created by removal of the salt. They should be compensated only for the value of the right to explore for and reduce to possession the minerals on the land in question. As land owners, the Hamiltons own all remaining rights in the land, and they are entitled to be compensated for the underground storage value of the land.

Counsel for the Hamiltons are instructed to prepare a judgment in accordance with these views to be submitted to the court within 10 days.

---

12. Harrell, *supra*, at pp. 320–323.

13. A finding that the mineral owner owned the hole in the ground created by his mining operations would bring consequences inconsistent with the most basic principles of mineral and property law. The mineral owner who has drilled a no longer producing well could then assert that he had the right to store salt water, or even hazardous waste materials, in this underground area. If the right of storage were held to inure to the benefit of the mineral owner, he might even assert that such storage was an exercise of his mineral servitude, thereby preventing the running of prescription.