No. 12,794.

ORLEANS AND JEFFERSON RAILWAY CO., LTD., VS. THE JEFFERSON AND LAKE PONTCHARTRAIN RAILWAY CO.

SYLLABUS.

1. A corporation regularly organized does not lose its general character as such from the fact that it purchases a street railway franchise from a city through whose streets a portion of its route passes.

2. A strip of land part of a larger tract which was acquired by a railroad company by purchase as far back as 1852, which it had at no time used, was not using and in all likelihood would never use for railroad purposes, is impressed with no immunity from the exercise of the power of Eminent Domain. If it is not needed by the owner for public use it is subject to be taken the same as that of any individual. (The Kansas City, Shreveport and Gulf Railway Co. vs. The Vicksburg, Shreveport and Texas Railroad Co., 49th Ann., 129.)

In determining what a fair compensation shall be to the owner for a right of way for a railroad over his property, the improved condition of the land sought to be utilized is a proper element in reaching conclusions. The owner is not entitled to recover what it would cost the expropriating company to bring other lands in the neighborhood up to a similar condition of improvement, but he is entitled to a reasonable remuneration in view of its condition having made it specially adapted and ready for railroad purposes. (Postal Company vs. Morgan's Company, 49th Ann., 60; Postal Telegraph Company vs. Louisiana Western Railway Co., 49 Ann., 1271.)

ON APPEAL from the Twenty-First Judicial District Court for the Parish of Jefferson. *Rost, J.*

---

*Carroll & Carroll, Robert J. Perkins* and *L. L. Labatt* for Plaintiff and Appelice.

*Dart & Kernan* for Defendant and Appellant.

Argued and submitted March 22, 1899.
Opinion handed down June 12, 1899.

The opinion of the court was delivered by

NICHOLLS, C. J.  In the petition filed by the plaintiff it alleged itself to be a railroad corporation organized under the laws of Louisiana, and its object to be "to lease, purchase, construct, operate, and maintain street railroads in the city of New Orleans and parishes of Orleans and Jefferson for the purpose of carrying passengers and freight."

It averred that the defendant company was the owner of certain land lying in the parish of Jefferson, which it described. That petitioner was then engaged in the construction of its line of road in the parish of Jefferson in accordance with its charter. That a portion of the land mentioned as belonging to the defendant and which it described, was required by it (petitioner) and the right over the same actually necessary to it for the construction of said railroad and public roads, which they were then actively building according to a described route.

The whole area of the land so declared to be necessary for a right of way was averred to be about seven acres, to be unimproved, of little or no value to defendant, and had not been used by it for any purpose for forty-five years.

Petitioner alleged that the Police Jury of Jefferson parish had granted to it a franchise to build and operate a railroad over its own portion of the desired route and, as far as it had the power as a political corporation to do so, had granted a franchise to build and operate a railroad over the property it was then seeking to expropriate.

That it had been unable to agree with the defendant for the purchase of the land or a right of way over the same, and expropriation proceedings were necessary.

In view of the premises, it prayed for a jury of free holders; for citation to defendant, and after due proceedings for judgment in its favor condemning to it a right of way as described upon paying defendant such damages and compensation as by the verdict of the jury and the judgment of court it might be decreed to pay.

Defendant answered, first pleading the general issue.

Orleans & Jefferson R. R. Co. vs. Jefferson & Lake Pontchartrain R. R. Co.

It admitted it was the owner of the property described in plaintiff's petition, but averred that it constituted a part of its road bed and right of way and was held and used under the railroad franchise conferred on it by the Legislature of Louisiana, and that if true it be that any franchise or right of way thereon had been conferred on the plaintiff by the Police Jury of Jefferson Parish, which, however, was not admitted but denied, the franchise or right of way was null and void, inasmuch as the parish of Jefferson was without power to interfere with the rights and privileges conferred on respondent by the Legislature and any such grant (if any existed), which was denied, was null and void, in violation of the Constitution of the United States and was an unwarranted interference with defendant's contract and vested rights.

Defendant averred that it needed all of said land for the exercise of its rights and privileges and for the operation of the railway which it then had in contemplation. That the plaintiff had already ample room on the street for all its purposes or necessities and there was adjoining said street abundant private property not used or needed for railway purposes and there was in law and fact no reason why respondent's road bed and right of way should be interfered with. That the plaintiff if successful would shut respondent out of the use and enjoyment of its said road bed or a material part. Respondent specially denied that plaintiff had ever been granted a right of way or franchise over respondent's land, and averred on the contrary that no such right had ever been conferred on plaintiff by the Parish of Jefferson, but if any such right or franchise had been granted the same was void and ineffectual, and the road bed and franchise of defendant railroad company could not be expropriated in favor of plaintiff to the exclusion and destruction of respondent's prior rights, grants and privileges.

It averred that it was not true that the land in question was valueless, but, on the contrary, it was a very valuable property, raised, well filled and graded, and plaintiff could not duplicate said road bed sought to be appropriated for less than twenty thousand dollars.

Defendant prayed for the rejection of plaintiff's demand. Upon the trial of the cause the jury returned a verdict for plaintiff and assessed the value of the property to be expropriated at five hundred dollars.

The District Court thereupon rendered judgment in favor of the

plaintiff and against the defendant, condemning to plaintiff upon payment by it to the defendant of the sum of five hundred dollars a right of way through the property of the defendant, which the judgment described.

It decreed that the plaintiff should not enter upon or take possession of said land for railroad purposes until it should have paid the sum of five hundred dollars, or in case of appeal from the judgment by defendant, until it should have deposited the said sum in the hands of the sheriff of Jefferson Parish, subject to the order of the defendant company.

Defendant appealed.

### OPINION.

Neither of the parties to this litigation denies the corporate capacity of the other.

The plaintiff company organized on the first of June, 1897, with over six incorporators, by notarial act before N. B. Trist, notary public for the parish of Orleans.

The incorporators declared that in so doing they availed themselves of the privileges of the laws of Louisiana, relative to the organization of corporations, and particularly of the act of the General Assembly of Louisiana, No. 36 of the session of the year 1888.

The declared object and purpose of the corporation were to lease, purchase, construct, operate and maintain street railroads in the city of New Orleans and parishes of Orleans and Jefferson for the purposes of carrying passengers and freight and furnishing power and light when necessary.

The defendant company was chartered by the General Assembly of Louisiana by act No. 79 of 1840.

The plaintiff sought in this proceeding to obtain by expropriation a right of way (fully described) over a part of a tract of land declared by it to belong to the defendant.

The defendant admits its ownership of the property. Plaintiff, in its petition, averred that the police jury of the parish of Jefferson, in which parish lies that portion of defendant's property on which the right of way is sought herein, had granted to it a franchise to build and operate a railroad over its portion the desired route and also as far as it had the power as a political corporation to do so, had granted it a franchise to build and operate a railroad over the property

which plaintiff was seeking to have expropriated from the defendant.

This allegation was made, we presume, in view of the fact that, adjoining on its upper line the property of the defendant on which the right of way was asked, was what was understood to be one of *the public roads* of the parish of Jefferson, along and over a part of which road plaintiff witn the consent of the police jury contemplated placing one of its tracks.

The defendant insists in this court that plaintiff had failed to prove the existence of this franchise from the police jury or to show that it had ever acquired a franchise which had been granted to any one else or a franchise assignable in character.

We do not understand plaintiff's right to expropriate defendant's property to rest upon any franchise granted to it by the authorities of the parish of Jefferson, but in right of its being a railroad corporation organized under the laws of the State. We do not think it any the less a railroad corporation because, its route leading partly through the city, it may have purchased a street franchise from the city authorities.

The parish of Jefferson has nothing to do with the expropriation of the property belonging to the defendant, while the existence or nonexistence of a franchise from the police jury of the parish of Jefferson to plaintiff to build and operate a railroad on one, or partly on one, of the public roads of that parish, would, in our opinion, not affect the situation at all, so far as the defendant is concerned.

If the plaintiff should attempt to build its road without legal authority or deflect in any way from the route assigned to it, the police jury will (we assume) see that it be made to keep within its rights.

Defendant complains that the plaintiff company should have selected the particular route it did over its property. It suggests that it might have gone further to the west and beyond the public road, where the lands are of little value, swampy and uninhabited, and where no one would be specially injured or inconvenienced, whereas the property which it proposes to take, is extremely valuable and precisely that over which defendant itself would run a road bed should it hereafter determine to operate a road again.

This court referring, in Railway Company vs. Railroad Company (49 Ann. 52), to a similar claim set up by the defendant therein, said: "While we have examined this phase of the controversy, it must seem difficult to maintain as the test of the expropriation that lands of

others than the proprietor should be taken. Expropriation in most instances is deemed a sacrifice by the proprietor called on to make the surrender.

"If one proprietor could defeat the expropriation on the ground that the call should be made on another, the supposed compulsion of the law, requiring private property for the public good, would be of no efficacy."

The defendant presses upon us that it is itself a public corporation, a railroad company and that its property should not be expropriated by another railroad unless in extreme cases.

If the defendant company has any legal existence (which under the pleadings has to be assumèd), the evidence shows that it has for a great many years past ceased to exercise any of its rights and powers or to perform any of its duties.

We find in different places in the record, statements of witnesses that it had long since died, deeply in debt, particularly to the Carrollton Railroad Company, and that this particular property in reality belongs to that company; that though it had at one time a road bed on the eastern portion of this property, and was a fully equipped railroad company, the ties and tracks had been taken up, the cars withdrawn, and every semblance of an actually living company had disappeared for over twenty years.

Not only has it held this real estate all this time, without it being necessary for its legitimate business or purposes, notwithstanding the provisions of Art. 237 of the Constitution of 1879, and Article 265 of that of 1898, but we have no evidence before us that it has or will ever have either the desire or the ability to resume operations.

The portion of defendant's property over which plaintiff seeks to obtain a right of way was never occupied by it as a road bed. Its road bed was considerably to the east of where plaintiff desires to locate its tracks and there is now intervening a wide canal separating the two portions of the land.

We understand the whole of the property to have been acquired by the defendant by purchase and not by expropriation.

Counsel of defendant in their brief thus refer to the property: "It was originally 182 feet wide by 3 and 3-8 miles long. Up to 1864 it was actually used by defendant, which operated a steam rail road thereon, chiefly built on trestles."

About the year named the rails were taken up.

In the year 1871 the city of New Orleans dug a canal through the strip, and the defendant sued out an injunction, but was defeated, and the action for the damages was held to be prescribed. (See Jefferson and Lake Ponchartrain Railway Company vs. City of New Orleans, 31 Ann., 478.)

In digging the canal, which is fifty feet wide, the excavated earth was thrown on the side now in controversy (the west side,) forming thereby a sound and now well settled road bed from five to seven feet higher than the surrounding country, and the latter is low and swampy.

It is in every respect an ideal road bed and could not be duplicated for $20,000.

If the defendant resumes operations it is evidently the only spot they would occupy, as the remainder of its property on the New Orleans side of the canal is marshy and it could not be used without a road bed or trestle work, and it would cost at least the sum named to put it in condition."

They further say: "The proof in this case is that the road bed in question (the new one) could not be duplicated for less than twenty thousand dollars.

The plaintiff did not attempt to disprove that this was so, but confined itself to the communistic argument that the road bed was placed there by the city of New Orleans, and as the defendant paid nothing for it, it was worth nothing and defendant could recover nothing and the jury evidently took this view of the matter.

Now we submit that this was not the proper way of approaching the question of value.

It is established that if this strip is taken from the defendant and it ever afterwards resumes operations, it will have to come to some agreement with the plaintiff for joint use of its track or it, the defendant, will have to create a road bed in the low marshy ground owned by it on the city side of the canal, and Major Harrod says it would cost the defendant at least twenty thousand dollars to put in a modern railroad for the use of modern cars. Therefore it is clear, aside from the value, per running foot, that the taking of this strip will *damage* the defendant in the exact sum which it will cost it to replace upon the other side of the canal, a similar railroad.

The witnesses examined for the plaintiff all say that they estimated

the property purely as country property and because their own neighboring lands are assessed at so much an acre.

We submit that this is not the true criterion; that the question is what does the property actually represent in value to a railroad corporation seeking to utilize it, and we are not able to comprehend how any man can go astray on such a question. The taking of this strip of land by the plaintiff company for the insignificant sum of five hundred dollars would be simply transferring out of the defendant's pocket into plaintiff's pocket the difference between that sum and what it would cost to lay down a similar road bed on Orleans street, or any vacant property in the neighborhood. (Telegraph Company vs. Railroad Company, 49 Ann., 1278)"

We think the defendant is justified by the evidence in saying that if the judgment of the District Court be affirmed, plaintiff will have acquired for five hundred dollars a road bed such as it would probably cost it fifteen or twenty thousand dollars to duplicate by one to be newly constructed on the soil adjacent to defendant's property and Orleans street.

If the cost of such a new road bed to the plaintiffs were to be taken as the test of the amount of their liability to the defendant for the privileges of the right of way, there is no doubt that the judgment rendered would fall far short of what defendant would be entitled to.

Defendant presents the questions of its rights before us not simply from this standpoint and that of the value of the land, but from that of the possible contingent damage to itself should it at any time hereafter elect or be able to resume business.

This last view of the situation would carry with it considerable force if there had been shown to us any likelihood of such a contingency happening, but as we have said, we have no reason to suppose that it will ever arise.

As matters stand we have before us a plaintiff very desirous of getting hold of what to it would be unquestionably an extremely valuable piece of property at a very small price, the property to be applied, however, to a *quasi* public use, and for presumptive public as well as private benefit, and a defendant, a substantially non-existent corporation holding this same property with no probability of ever using it itself for the purpose for which it was purchased and for which that company was organized.

FIFTY-FIRST ANNUAL REPORTS, 1899.　1613.

Orleans & Jefferson R. R. Co. vs. Jefferson & Lake Pontchartrain R. R. Co.

It is our duty to make law and justice and right meet as far as it is within our power to do so.

We are forced to concede the right of the plaintiff to have this property expropriated.

The case falls directly under the principles announced by us in the case of the Kansas City, Shreveport and Gulf Railway Company vs. The Vicksburg, Shreveport and Pacific Railroad Company, reported in 49 Ann., page 29.

There, as here, the property sought to be expropriated by the plaintiff had been purchased by the defendant company and not acquired by it under expropriation proceedings; there, as here, the defendant company had not used, was not using and would not probably use the property sought to be appropriated for railroad purposes; certainly not in the near future.

Referring to this condition of things we said: "The question then is whether the land, the subject of this controversy, is in public use. If not, it is subject to be taken as that of any individual. If a corporation acquires more land than it requires for its uses the land not needed is impressed with no immunity from the exercise of that power to which it must submit. The land involved in this case (part and a small part only of a larger space) was acquired by purchase in 1858. In all that long period the defendant has had but one single track. They added another when the plaintiffs manifested their intention to lay its tracks alongside of defendant's. With neither track of defendants does this expropriation propose the least interference. The land proposed to be taken is further east and devoted to no use whatever by defendant nor has it ever been in the half century of defendant's ownership.

"We appreciate that in estimating the land of defendant liable to expropriation, that in actual use should not be the rigid limit, but there should be a reasonable regard for probable increased wants of the owner.

"But in this case we are confronted with the fact that one track has amply served defendant for years; that it has laid another and has space left reasonably sufficient, if there is any force in testimony, for additional tracks or other purposes.

"There is here no use nor any reasonable probability of future use if testimony is to guide us, or if possible uses can be invoked at all."

If one road, by a judicious purchase beyond its present or probable

necessities of property favorably situated for railroad rights of way could successfully prevent the whole of the same from coming under the operation of the expropriation laws, it would be enabled more or less to shut out future competition with itself, and bar legitimate progress. The fact that a railroad company should have selected a particular piece of property for its purposes by reason of its being able from its peculiar condition to be made use of for that purpose at small expense, while the selection of other properties would have carried with it large outlays, is one which we ought to consider in estimating how much the company should pay for the property, but we should not permit the owners of such desirable properties to carry their pretensions by reason of such fact too far.

If they do not need the property themselves and it is needed for public use, they should not be allowed to force the company requiring such property to a useless expenditure of money by driving them to the expropriation of unsuitable property or exacting from it an amount exactly equivalent to what would have been such outlay on its part. They should be made to surrender the property for public use for a fair and reasonable compensation. On the other hand we should not ignore in this matter as a factor the element of private advantage which after all underlies the creation of these railroad corporations.

Their purpose is not so exclusively public (Art. 428 Civil Code) as to justify their obtaining this gain without taking into consideration to some extent the corresponding right of other parties to advance their own interests.

In Postal Co. vs. Morgan's Co., 49 Ann., 60, and Postal Telegraph Company vs. Louisiana Western Railway Company, 49 Ann., 1279, we had occasion to examine this matter. In the former case we said: "The lands along defendant's right of way may be of peculiar or particular value for specific purposes, but we do not understand that they are now devoted to those uses. The plaintiff must, however, make compensation proportionately for the cost and expense of defendant putting in condition the right of way. It can not avail itself of improved conditions without compensation;" and in the latter, citing the opinion just referred to and quoting from Griswold vs. St. Louis, etc., R. R. Co., to the effect that "when the use made of the land is simply temporary, the measure of value is not the full value of the land, but only a fair recompense to the owner for the use made of it and for

FIFTY-FIRST ANNUAL REPORTS, 1899. 1615

Orleans & Jefferson R. R. Co. vs. Jefferson & Lake Pontchartrain R. R. Co.

any injury done to it" we said: "We think the standard there adopted a just one, which can well be taken for cases like the present."

"In determining what a fair compensation would be, the improved condition of the land sought to be used is a proper element in reaching conclusions. The defendants are not entitled to recover the original costs of improvements, but are entitled to reasonable remuneration in view of the same (Am. and Eng. Ency. of Law, Vol. 6, p. 558)."

We also said that it would be difficult to ascertain the "market value" of the land taken up for the erection of a telephone line over a rail road's right of way, even if the railroad company held the fee; that "when once the land which is included in such a right of way has become separated from the different tracts of which it originally formed part it has practically become *hors de commerce* as land. The value of the lands from which they have become detached under the decree of right of way furnishes a poor basis for determining that of the land within the right of way, as the latter has ceased to be available for general purposes." It appears from the testimony in this case that the land sought to be appropriated by the plaintiff would to-day, had it been left in its original condition, be of no great value for farming or other general purposes, and that for such purposes it has not been at all improved by having been raised for several feet by the earth thrown from the excavation of the canal, but to the contrary. Simply as land it must have obviously lost in value, as it can no longer be reached for cultivation and can only be utilized longitudinally. While it had in its existing condition a large or dormant value for particular purposes, it required some particular occasion or call to bring this out, but when such occasion did arise, then the very fact which had lessened its immediate availability for other purposes and relatively to other portions of the same property, caused it to exhibit an intrinsic value so far in excess of those lands as to make them cease to serve as any proper basis of comparison.

It is no unusual circumstance for owners of lands deemed almost valueless to become men of immense fortunes by reason of advancing civilization and modern wants carrying with them industries for which they are specially appropriate and adapted; and not only this, but it is frequently due to the situation of some particular spot upon those places through which has been developed the fact of this intrinsic value. Section 1842 of the Revised Statutes declares that "in estimating the value of the property to be expropriated the basis of

·assessment shall be the true value of the land before the contemplated improvement was proposed and without deducting therefrom any amount for the contemplated improvement."

Lewis on Eminent Domain, section 478, referring to the general principles bearing upon the subject of estimating values, says: "In estimating the value of property taken for public use it is the market value of the property which is to be considered. The market value of property is the price which it will bring when it is offered for sale by one who desires but is not *obliged* to sell it and is bought by one who is under no *necessity* of having it.

"In estimating its value all the capabilities of the property and all the uses to which it may be applied or for which it is adapted are to be considered and not merely the condition it is in at the time and the use to which it is then applied by the owner. (Section 49.) The market value of property includes its value for any use to which it may be put. If by reason of its surroundings or its natural advantages or its artificial improvements or its intrinsic character it is peculiarly adapted to some particular use, all the circumstances which make up this adaptability may be shown and the fact of such adaptation may be taken into account in estimating the compensation."

"Some of the authorities hold that its value for a particular use may be proved, but the proper inquiry is, what is its market value? in view of any use to which it may be applied and of all the uses to which it is adapted. In Boom Co. vs. Patterson, the defendant owned the greater part of three islands in the Mississippi river above the falls of St. Anthony, which were so situated with reference to the west shore as to be admirably adapted for boom purposes. In a proceeding to condemn those islands by a boom company the jury found a general verdict for $9358, and also found specially that the value of the land taken aside from any consideration of its value for boom purposes was $300, and in view of its adaptability for those purposes was worth the further sum·of $9058. The Supreme Court of the United States sustained the general verdict and in giving their decision say: 'In determining the value of land appropriated for public use the same considerations are to be regarded as in a sale between private parties.'

"The inquiry in such cases must be, what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted; that is to say, what is it worth from its availability

for valuable uses. Property is not to be deemed worthless because the owner allows it to go to waste or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it and make it subserve the necessities or conveniences of life. Its capability of being thus available gives it a market value which can be readily estimated."

"So many and varied are the circumstances to be considered in determining the value of property condemned for public purposes that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but as a general thing we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community or such as may be reasonably expected in the immediate future. The position of the three islands in the Mississippi fitting them to form in connection with the west bank of the river a boom of immense dimensions, capable of holding over twenty millions of logs, adds largely to the value of those lands."

"The boom company would greatly prefer them to more valuable agricultural lands or to lands situated elsewhere on the river; as by utilizing them in the manner proposed they would save heavy expenditures of money in constructing a boom of equal capacity. Their adaptability for boom purposes was a circumstance therefore which the owner had a right to insist upon as an element in estimating the value of his land."

"So it is proper to show that property possesses a peculiar value for railroad purposes, for market gardening, for raising cranberries, for warehouse purposes or for a bridge site. It is proper to show that the property is suitable for division into city lots and that it is valuable for that purpose."

The author citing the case of Matter of New York L. & W. R. R. Co., 27 Hun., 116, says:

"The latter case was a proceeding to condemn a strip of land about thirty miles long belonging to the Junction Canal and R. R. Co., which had formerly been used for a canal. It was especially valuable for railroad purposes and was held by the company with a view to its use for that purpose at some time. It was of little value for any use except a railroad. It was held proper to show its value for railroad purposes and an award of about $60,000 was sustained."

102

Lewis, in section 500, referring to the enhancement in value caused by the work or improvement, says: "Whatever the time fixed upon with reference to which the compensation shall be estimated, the owner is entitled to the actual value of the land at that time, even though it may have been enhanced by reason of the projected improvement for which it may be taken. This is not really making the condemning party pay for an enhancement caused by its own work.

"Such enhancement does not come from the mere projection of the work, but from the existence of circumstances which create a demand for the work and render it probable that such a work will sooner or later be built. It is not proper, however, to consider what the property would have been worth if it could have had the benefit of the proposed improvement without being taken."

The argument has not been pressed upon us, but it lies directly in the path of our decision, and we feel called on to refer to it, that should we attach to this defendant's land or that particular portion of it which plaintiff seeks to expropriate, a greater value than that of the adjacent lands or the balance of this particular tract, we will do so in spite of the rule laid down by the law makers in section 1842 of the Revised Statutes, that "in estimating the value of the property to be expropriated the basis of assessment shall be the true value which the land possessed before the contemplated improvement was proposed."

That inasmuch as the defendant had no call for this land prior to the contemplated building of this road, at a rate higher than that of the surrounding properties, it would necessarily follow that any increase of price above this would be entirely due to the building of the road.

The argument gave us at first some trouble by reason of the peculiar phraseology of our statute, but a little consideration satisfied us that it was more specious than real.

If actual call or demand for purchase for a particular piece of property should be taken as the test of its true value, the doctrine, when followed up to its logical conclusion, would, we think, result in this case in plaintiff's obtaining this land for nothing, for we question very much whether during the long ownership of it by the defendant it has received a single bid for it, or whether it will have another one, unless in the far future. We are not called on to attempt any definition of the word "value," or to say of what elements it is composed, but we think that, while present active demand affects value, it is not

of its essence, and that there is such a thing as an absolute intrinsic value to property independent of offers to purchase, and that value in-cludes in it at all times the possibilities of the future. We think that the purposes of the law makers in enacting section 1842 of the Re-vised Statutes was to prevent the owners of property on which a con-templated public improvement was about to be made, from availing themselves of the increased value which would be given to that prop-erty by the making of the improvement; in other words, that a rail-road company (if the contemplated improvement was to be a railroad) "should not (in the language of the last section quoted from Lewis) be made to pay for its own work, and not that the owners of said property should be deprived of the right to avail themselves of the special adaptability of their land for railroad purposes. It will not do in this case to say that any increase of value assigned to this strip of land by our decree over and above the value of the surrounding and adjacent lands would be due to the building of this road. So far from the building of the road giving value to the land, it is the special con-dition, situation and value of the strip which is the real *raison d'etre* of the building of the road.

There is great reason for doubt whether the road would be built at all but for the existence of this strip, ready prepared, as it were, for a road bed. Whether the plaintiff company when organized and oper-ated will prove a paying investment or not remains to be seen, but certainly in calculating as to the profits of a future road, the small amount required for its construction arising from the very fact of the existence of this road bed, was considered an all important factor by the promoters of this company in reaching a conclusion as to whether the road would be an assured success. *Non constat* that this road would have been built at all had the company been compelled to construct its road to the west of Orleans street along those lands in their natural condition. They could have done so had they de-sired. The running of the road along this particular strip was a matter of selection, not absolute necessity, and the same reasons which impelled them to make the selection should throw upon them the duty of making due compensation, for the selection, to the owners of the property. The plaintiff does not seek, nor should it be granted, more than a right of way over this land, but for this use and occupation they should pay a fair and reasonable price.

It is difficult to deal with this matter of value by exact testimony,

which of itself when brought to its last analysis is after all very much. a matter of simple opinion.

In considering the subject, courts and juries are forced, as was said' in 52 Pac., 207-208, to exercise and rest upon "good sense and sound discretion."

We think the jury in this case was influenced through and felt bound by testimony which really furnished no proper basis for them to act upon.

We do not think defendant was accorded the remuneration or com-pensation it is justly entitled to. We think it should be larger.

For the reasons assigned, it is hereby ordered, adjudged and de-creed that the judgment appealed from be amended so as to read:

"It is ordered, adjudged and decreed, that there be judgment in favor of the plaintiff, the Orleans and Jefferson Railway Co., Lim-ited, condemning to said plaintiff upon payment by said plaintiff to the defendant, the Jefferson and Lake Pontchartrain Railway Co., of the sum of twenty-five hundred dollars, a right of way through the property of said defendant in the parish of Jefferson, said property being: a certain tract of land situated on the Metairie Road, in the parish of Jefferson, in this State, adjoining the parish of Orleans, and measuring about one arpent front on each side of the said Metairie Road, by a depth extending to Lake Pontchartrain on the northern side, and to North Line street on the lands formerly belonging to Macarty and Lacusse on the southern side, as is more fully described in an act of sale by Griffon to Beaulien, before Peter Pedesclaux, late notary public, on July 15, 1814—the said right of way to be on, over and through a portion of the land described above; comprising about seven acres, and described as follows: Starting at a point marked A on the plan hereinafter referred to, at the river side of Geranium street, in Metairieville, opposite the northeast corner of square num-ber seven, and at a distance of twenty-five feet therefrom; thence (A) along the east side of Orleans street; towards Lake Pontchartrain to a point twenty-five feet east of the northeast corner of square one hundred and twenty-nine, about 15,750 feet (Metairieville): (B) thence easterly and at right angles to Orleans street, twenty-five feet to a point on the bank of the Upper Line canal; (C) thence in a south-erly direction, parallel to Orleans street, three hundred and nineteen feet, to a point on the bank of said canal; (D) thence easterly along the continuation of the north side of Plane street to the dividing line

between the parishes of Orleans and Jefferson; (E) thence, along the said parish line fifty feet to the prolongation of the south side of Plane street; (F) thence, westerly along said prolongation to a point on the bank of the canal twenty-five feet from Orleans street; (G) thence along the bank of the Upper Line canal to a point on said bank east of the point of departure, A; (H) thence westerly to said point of departure, A;—all as will more fully appear from a plan of said lands marked Exhibit A and annexed to and made part of the petition herein filed."

The judgment appealed from as so amended is affirmed. Costs of both courts to be paid by the plaintiffs.