[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
These proceedings are appeals from the assessment of damage by condemnation that have come to the court on the wrong procedural track, to which they had been directed by the court clerk on instruction from the Civil Court Manager of the Court Operations Division. Instead of being entered on the court records as separate civil actions with payment of the entry fee required by General Statutes Section 52-259, these appeals and applications for review of statement of compensation were filed, without payment of the statutory entry fee, as further pleadings in the above-numbered and titled court dockets, respectively, previously created for the deposit with the clerk of the Superior Court of the assessed damage in the amount of $1,175, in Docket No. 579139, and in the amount of $1,575, in Docket No. 579140. See City of Bristol v. Sebastiano A. Milano et al.,45 Conn. Sup. 605.
In Docket No. 579139, Towpath Associates, property owners, have appealed from the assessment of damage paid by the Commissioner of Transportation for the taking by eminent domain on April 9, 1998, pursuant to General Statutes Section 13a-73
(b), of their property found to be necessary for the layout, alteration, extension, widening, change of grade and improvement of the highway commonly known as Powder Mill Road. Said premises are situated in the Town of Canton, on the easterly side of Powder Mill Road, containing 17,160 square feet, more or less, bounded and described as follows and shown on the map hereinafter referred to:
 WESTERLY — by Powder Mill Road, a total distance of 416 feet, more or less;
 NORTHERLY — by land now or formerly of Joseph F. Wilusz, 54 feet, more or less, being the centerline of the Nepaug River; CT Page 12331
 EASTERLY — by other land of the owners and land now or formerly of The Metropolitan District, each in part, a total distance of 394 feet, more or less, being a line designated "TAKING LINE," as shown on said map;
SOUTHERLY — running to a point.
Said premises are more particularly delineated on a map entitled: "TOWN OF CANTON MAP SHOWING LAND ACQUIRED FROM TOWPATH ASSOCIATES BY THE STATE OF CONNECTICUT POWDER MILL ROAD BRIDGE SCALE 1" = 40' MAY 30 1995 JAMES F. BYRNES, JR — TRANSPORTATION CHIEF ENGINEER BUREAU OF ENGINEERING AND HIGHWAY OPERATIONS." Sheet 1 of 1 (23-118-3).
The above-described premises are a portion of the premises contained in a Warranty Deed, dated December 5, 1977, and recorded in Volume 104 at Page 904 of the Canton Land Records, and are subject to an easement for utilities in favor of Linda Diane Wells et al., dated December 28, 1995 and recorded in Volume 211 at Page 15 of said land records.
In Docket No. 579140, Joseph F. Wilusz and Carol S. Wilusz, executrix of the estate of Joseph P. Wilusz, owners, have appealed from the assessment of damage paid by the Commissioner of Transportation for the taking by eminent domain on April 9, 1998, pursuant to General Statutes Sections 13a-73 (b) and13a-98e, of their property found to be necessary for the layout, alteration, extension, widening, change of grade and improvement of the highway known as Powder Mill Road. Section 13a-98e, as defined by Section 13a-98m, authorizes the acquisition of land for any state or locally maintained roadway eligible for the Federal surface transportation urban program funding.
The Wilusz premises taken in Docket No. 579140 are situated in the Town of Canton, on the easterly side of Powder Mill Road, containing 27,340 square feet, more or less, bounded and described as follows and shown on the map hereinafter referred to:
 WESTERLY — by Powder Mill Road, and land now or formerly of The Metropolitan District, each in part, a total distance of 614 feet, more or less;
NORTHWESTERLY — running to a point; CT Page 12332
 NORTHEASTERLY — by owners' remaining land, 292 feet, more or less, being a line designated "TAKING LINE," as shown on said map;
 EASTERLY — by land now or formerly of The Metropolitan District, 170 feet, more or less;
 EASTERLY AGAIN — by owners' remaining land, 194 feet, more or less;
 SOUTHERLY — by land now or formerly of Towpath Associates, 54 feet, more or less, being the centerline of the Nepaug River.
Said premises are more particularly delineated on a map entitled: "TOWN OF CANTON MAP SHOWING LAND ACQUIRED FROM JOSEPH F. WILUSZ BY THE STATE OF CONNECTICUT POWDER MILL ROAD BRIDGE SCALE 1" = 40' MAY 30 1995 JAMES F. BYRNES, JR. — TRANSPORTATION CHIEF ENGINEER BUREAU OF ENGINEERING AND HIGHWAY OPERATIONS". Sheet 1 OF 1 (23-118-2).
The above-described premises are conveyed subject to such rights and easements as appear of record, and are portions of the premises contained in a Warranty Deed dated March 24, 1956, and recorded in Volume 52 at Page 85 of the Canton Land Records.
The owners have appealed under the provisions of General Statutes Section 13a-76. In the adjudication of this appeal and review of statement of compensation, the court heard evidence, including the testimony of witnesses and expert witnesses, examined appraisal reports and other documentary evidence, and viewed the subject property and its surrounding area.
The subject lands are at street grade, but then slope down to the east. They are covered with brush and trees. The northerly portion of the Towpath taking is located in the Nepaug River, the center line of the water being the northerly property line; the southerly portion of the Wilusz taking is located in the Nepaug River, the center line of the water being the southerly property line. Located on each of the Towpath and Wilusz river banks is a stone bridge abutment, estimated to be about 140 years old and to have an additional life span of 100 years. These abutment structures were formerly used to support a railroad bridge spanning the river. No other portion of the former railroad CT Page 12333 bridge now exists. The railroad tracks formerly on the two properties are gone, but the track bed and railroad embankment remain on each of the properties, extending from the two abutments.
The two subject properties are located in a designated flood plain district, and have a zoning classification of Residence AR-1. This zone allows single family dwellings on one-half acre lots. The neighborhood is located in the Collinsviile section of Canton and is proximate to the Farmington River. The neighborhood is residential, with some commercial and municipal uses evident. A large portion of the immediate neighborhood consists of the Farmington and Nepaug Rivers, the Nepaug Reservoir and land of The Metropolitan District.
In Docket No. 579139, the recent chain of title of the subject property as disclosed by the owners and their appraiser is relevant to their claims in this eminent domain proceeding. On December 5, 1977, Towpath Associates owned six acres of land in the Town of Canton bounded generally by the Nepaug River on the north, the Farmington River on the east, other properties on the south, and Powder Mill Road on the west. A portion of this property was transferred by them on December 28, 1995, by warranty survivorship deed, recorded in the Canton Land Records in Volume 211, Page 15, to Linda Diane Wells and Peter Derek Wells for $65,000. By quitclaim deed dated November 7, 1997, recorded in the Canton Land Records in Volume 225, Page 150, Linda Diane Wells and Peter Derek Wells transferred back to Towpath Associates that portion of their property consisting of the premises subsequently taken five months later on April 9, 1998, in this condemnation action. For that reason, the subject property taken was a total taking.
Notwithstanding the title history of the subject property, Towpath's appraiser, Peter R. Marsele, compiled his appraisal report and valuation of the property taken as a partial taking. His estimate of damage, therefore, was based upon the difference in valuations of the total property before, and the property remaining after the taking.
Marsele's inspection of the Towpath property took place on September 27, 1998. He described the land being appraised by him, located at No. 25 Powder Hill Road, as consisting of six acres, having been acquired on December 8, 1977, by deed recorded in Volume 104, Page 904, of the Canton Land Records, with 1,230 feet CT Page 12334 of frontage on the east side of the street.
The highest and best use of the property in his opinion was the use of the existing bridge abutment as proposed by the state in the relocation of Powder Mill Road.
Towpath's appraisal of the subject property was circuitous. Treating the taking as partial in scope, their appraiser first undertook to value, by comparable sales of five flood zone properties, the entire six acres of land originally owned by Towpath from 1977 until 1995, when a portion was sold for $65,000 to Wells. In 1997, Wells retransferred to Towpath, "for One Dollar ($1.00) and other valuable consideration," but without conveyance tax payment, the property taken by this condemnation five months later in 1998. Three of the comparable sales were located in Glastonbury, one in South Windsor, and the last in Avon, of which only about 25% was in a flood hazard zone. These sales ranged in price from $1,000 to $2,000 per acre. Without specific adjustment to price, the appraiser estimated the market value of the land only to be $1,200 per acre, or a total value of $7,200 for the entire six acres.
James A. Thompson, P.E., of Buck Buck, Engineers, testified concerning the cost of construction of the new bridge abutment to be built upon the former Towpath property, replacing the now unused old railroad abutment, as part of a new highway overpass structure replacing the former railroad bridge, in connection with the realignment of Powder Mill Road. In particular, he estimated the value of that portion of the new construction that would be made unnecessary because of the existing bridge abutment on the subject property. The engineer's reported estimate of this construction cost saving was adopted by Towpath's appraiser as the value of the existing bridge abutment on the river bank. This estimate of $91,271 was rounded by the appraiser to a value of $91,300, for the valuation of the structure. In recapitulation of his market value analysis, Marsele estimated the value of the land, six acres, based upon a market sales comparison, to be $7,200, and the value of the bridge abutment, based upon a cost approach, to be $91,300, for a total property value before taking of $98,500.
The Towpath taking consisted of 17,160 square feet in fee simple, including the bridge abutment located on that portion, plus a right to use a 20 foot wide strip of land on the remainder of land. In his after taking valuation, the appraiser utilized CT Page 12335 the same sales and value analysis used for his before taking estimate. Since the remaining land was not adversely affected by the taking, he applied the unit price of $1,200 per acre to the reduced area of 5.6061 acres for a land value of $6,727, rounded to $6,700. Since the bridge abutment was taken, there was no additional value for it to the remaining land. The total value of the remaining land after taking was $6,700. Subtracting this estimate from the value before taking of $98,500, he found the total damages to Towpath to be $91,800.
Marsele's inspection of the Wilusz property was made contemporaneously with that of the Towpath parcel. The Wilusz condemnation was a partial taking of 17,160 square feet, approximately 0.63% of an acre, from Marsele's calculation of a total area of 2.058 acres. In his opinion, the highest and best use of the Wilusz land was the same as that for the Towpath property, namely, the use of the existing bridge abutment to relocate Powder Mill Road as proposed by the taking in this proceeding.
In his market approach to the value of the 2.058 acres of the Wilusz parcel, Marsele used the same five comparable sales utilized for the Towpath appraisal. Based on these, he again estimated the market value of the land only to be $1,200 per acre, or a total value of $2,470, or $2,500, for 2.058 acres.
In the Wilusz appraisal, his valuation of the railroad bridge abutment on the north bank of the Nepaug River was based on a cost approach. This again he based on the engineer's estimate of the value of that portion of the new construction that would be made unnecessary because of the existing bridge abutment on the Wilusz property. This construction cost saving was adopted by the appraiser as the value of the existing bridge abutment on the subject property, estimated at $91,271, rounded to $91,300.
In his recapitulation, Marsele estimated the value of the land, 2.058 acres, based upon a market sales comparison, to be $2,500, and the value of the bridge abutment, based upon a cost approach, to be $91,300, for a total property value before the taking of $93,800. The total value of the remaining land, 1.43 acres, was $1,700. The difference, or $92,100, was his estimate of damage by the Wilusz taking.
The Commissioner's appraiser, Cynthia L. Bezz, lacked comprehension in the scope and conclusions of her appraisals of CT Page 12336 both properties. She utilized the comparable sales analysis in her appraisals of the lands taken. In her estimation, the abutments existing on the riverbanks had no market value and did not increase the value of the land taken in either condemnation. They were of no consequence in her findings of damage.
In her appraisal of the Towpath taking, Bezz described the subject property as containing about 0.51 acre, consisting of residential land located on the east side of Powder Mill Road. The site is irregularly shaped and is the area previously owned by the New York, New Haven Hartford Railroad Company. The site is vacant and unimproved. Although located in the AR-1 Residential zone, the property lies within the AE zone as determined by the Federal Emergency Management Agency. The AE zone is an area with base flood elevations determined, and represents special flood hazard areas with flooding anticipated to occur every 100 years. Areas within the FEMA flood zones are considered to be within the town's Flood Plain District.
Accordingly to the local zoning regulations, no development is permitted which would result in any increase of flood level by more than one foot at any point during the base flood. Because of this restriction, she claimed that the subject site cannot be developed. This conclusion is erroneous. Section 53.9 of the zoning regulations provides as follows: "Permitted Uses in theFloodway: The following uses are permitted by right in a Floodway Zone to the extent they are not prohibited by any other ordinance and provided no "development' takes place which would result in any increase of flood level by more than one foot at any point during the base flood. As used herein the term "development' means any man-made change to improved or unimproved real estate, including but not limited to buildings or structures of any nature, fences or barriers of any nature, mining, dredging, fillings, grading, paving, excavating, or drilling."
Based on this false premise, the appraiser concluded: "The Highest and Best Use, therefore, is its continued present use as vacant/flood zone land." Further, because of this conclusion, she determined that the property should be compared to other similar flood zone/open space sales, rather than typical residential land sales. Three sales of "flood plain" properties were analyzed.
The first sale was located on First Lane, Wethersfield, 18 miles east of the subject land. This consisted of 5.5 acres in the Connecticut River flood plain, and within the 100 year flood CT Page 12337 zone. The second sale was located on Route 80, Madison, 35.5 miles south, consisting of 2.7 acres of residential land, mostly wetlands. The third sale was in Ely Meadows, Lyme, 43 miles southeast, consisting of a 4.5 acre parcel of land within the 100 year flood zone.
These sales ranged in unit value from $1,923 to $3,889 per acre. With minor adjustments for "Site/View," adjusted unit values increased to a range of $2,308 to $4,667 per acre. Based on these sales, the appraiser estimated a unit value of $3,000 per acre for the subject property. The before value was calculated as follows: 0.51 acre x $3,000 per acre $1,350. The same sales were utilized for the after taking value. This was calculated as follows: 0.12 acre x $3,000 per acre = $360. The difference or damage to Towpath Associates was concluded to be $1,170, rounded to $1,175.
The Bezz appraisal of the Wilusz property followed the template or pattern of the Towpath appraisal. Her findings of the highest and best use of the Wilusz property was "its continued present use as vacant/flood zone/grazing land." Using the same comparable sales found for the Towpath appraisal, but with different adjustments, she concluded that the sales supported a unit value of $2,500 per acre for the Wilusz property. The before value was calculated as follows: 8.03 acres x $2,500 per acre = $20,075. The same sales were utilized for the after taking value. This was calculated as follows: 7.4 acres x $2,500 per acre = $18,500. The difference or damage was concluded to be $1,575.
The stated purpose of these condemnations pursuant to General Statutes Section 13a-73 (b) 73(b) the statutory terms of necessity "for the layout, alteration, extension, widening, change of grade or improvement of any state highway." The existing Powder Mill Road bridge is presently unused. It is unsafe for vehicular use, and dangerous for pedestrians. It has deteriorated to the extent where it is impassable. Open holes exist in its pavement because of the lack of maintenance and disrepair. A significant fact is that the top of the abandoned railroad bridge abutment and track bed are at or about the grade of the adjoining Powder Mill Road and its antiquated bridge.
The project undertaken for these condemnations is "The Replacement of Bridge 04490 and the Realignment of Powder Mill Road in the Town of Canton." A review of the engineering plans for this construction on the subject premises shows the CT Page 12338 utilization of the bridge "abutment" and "abandoned railroad bed" in the bridge and highway replacement and relocation. Three engineering and construction notations on the plans in exhibit are of relevance in this action: (1) "SEE . . . FOR LIMIT OF STONE MASONRY TO REMAIN;" (2) "NOTE STONES REMOVED FROM THE EXISTING MASONRY ABUTMENTS ARE TO BE SALVAGED FOR REUSE AS WINGWALL CAP STONES. STONES NOT INCORPORATED INTO THE FINAL WORK WILL BECOME THE PROPERTY OF THE TOWN OF CANTON;" AND (3) "EXTREME CARE SHALL BE EXERCISED NOT TO DAMAGE EXISTING STONE MASONRY TO REMAIN IN ANY WAY PARTICULARLY DURING REMOVAL OF EXISTING MASONRY, DURING STRUCTURE EXCAVATION AND DURING INSTALLATION OF PILES."
It is concluded from a reading of these plans and evident attendant circumstances that these condemnations sought to relocate the bridge and Powder Mill Road to the most adaptable site in close proximity to, or adjoining their original locations, utilizing as much as feasible from engineering and construction viewpoints, and as a cost saving to the taxpayers, of the existing bridge abutment and abandoned railroad track bed.
"Under the provisions of [General Statutes] Section 8-125 (f) real property for the purposes of taking is defined as `land, subterranean or subsurface rights, structures., . . . and every estate, right or interest therein.' (Emphasis added.) Every structure which has `been erected and affixed to the soil so far as to become part of the real estate' is taken by the condemnor as a matter of law and `the value of the buildings must be considered in determining the compensation be awarded to the owner.' 2 Nichols, Eminent Domain (Rev.3d Ed.) Section 5.81(1). In the early case of Capen v. Peckham, 35 Conn. 88, 94, the court recognized the difficulty in laying down a rule of universal applicability. The court stated: `[I]t is essential to constitute a fixture that an article should not only be annexed to the freehold, but that it should clearly appear from an inspection of the property itself, taking into consideration the character of the annexation, the nature and the adaptation of the article annexed to the uses and purposes to which that part of the building was appropriated at the time the annexation was made, and the relation of the party making it to the property in question, that a permanent accession to the freehold was intended to be made by the annexation of the article.'" Toffolon v. Avon,173 Conn. 525, 534.
The abandoned bridge abutments and railroad trackbed existing CT Page 12339 on the subject properties are such structures that have become a part of the real estate, and their value must be considered in determining the compensation to be paid to the condemnee. They constitute an improvement to the subject property. The land, together with these improvements, is to be evaluated as a whole, rather than being valued separately in a summation approach. 4 Nichols, Eminent Domain (Rev.3d Ed.) Section 13.04[2]. The award must be based on the "value of the land as enhanced by the improvement." 2 Orgel, Valuation under Eminent Domain (2d Ed.) Section 189, p. 7.
It is now the accepted doctrine that reproduction cost is admissible when the structures or improvements are adapted to the land. Orgel, supra, Section 191, p. 17. Whenever reproduction cost is offered as evidence, the court should make every effort to assure a full deduction for those elusive forms of depreciation, obsolescence and inadequacy, that are so often disregarded by all but the most careful appraisers. Orgel, supra. Section 199, p. 57. "It has come to be recognized that, in addition to depreciation in the form of structural depreciation resulting from wear and tear and other sources of physical deterioration, the element of depreciation usually referred to as functional depreciation frequently affects value because of obsolescence of the property or its loss of adaptability. 5 Nichols, Eminent Domain (3d Ed.) Section 20.3; 2 Orgel, Valuation under Eminent Domain (2d Ed.) Section 197. Such an element of depreciation results from a change of neighborhood or from other extrinsic economic factors having a direct bearing on the value of the property. We have approved its use. . . . It is clear that the property here was of a nature such that it could not properly be valued by the reproduction method alone unless consideration was given to obsolescence." Moss v. New Haven Redevelopment Agency,146 Conn. 421, 426-27.
In the absence of damage to the remainder, the owner is limited to the value of the part taken. 5 Nichols, Eminent Domain, (3d Ed.) Section 16.04. "The condemnee is entitled to at least the fair market value of the land actually taken and, so long as no claim of resulting benefit to the remaining land is involved, it is not for the state to complain if he confines his claim to that value and asks nothing for damage to his remaining land." Hollister v. Cox, 131 Conn. 523, 527.
Appraising flood plain properties requires more analysis than the average land appraisal. First, the appraiser must determine CT Page 12340 whether or not the subject is located within a flood plain. Second the appraiser should determine the elevation of the land and compare this elevation with the base flood elevation. The difference between the land elevation and the base flood elevation is the depth of flood, which is a very important consideration. Third, the appraiser should check with those persons who are knowledgeable about the subject property to determine the general reputation of the property for flooding. Fourth, the appraiser should obtain information about the development of vacant land in the flood plain. 9 Nichols, Eminent Domain, (3d Ed.) Section 34.01.
The state's appraiser, as noted earlier, lacked comprehension in the scope and conclusions of her appraisals. The elevation of the subject properties, and, in particular, of the abandoned railroad track bed, is not furnished in her reports. As a consequence, no comparison of the elevation of the land with the base flood elevation has been, or can be, made to determine the depth of any flood. As noted above, this is a very important consideration in such an appraisal.
The Flood Plain District overlaps other zoning districts, and is defined in Section 53.5 of the zoning regulations as "those areas within the bounds of the `100 year flood' or the `base flood' presented in the Zoning Regulations." The Flood Plain District is further divided into two zones: (1) The "Floodway" is the channel of a watercourse and the adjacent area that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one foot at any point. Section 53.6.1. (2) The "Flood Fringe" is that area between the Floodway and the outer limits of the base flood. It encompasses the area which can be encroached without raising the water surface elevation of the base flood more than one foot. Section 53.6.2.
Section 53.9 permits development as of right in the Floodway, and Section 53.11 permits the same in the Flood Fringe, provided this does not increase the flood level by more than one foot at any point during the base flood. Bridges are allowed in both of these zones as a special exception with the same flood level restriction. Sections 53.10.4 and 53.12.1.
In determining the market value of a piece of real property for the purposes of a taking by eminent domain, it is not merely the value of the property as it is used by the owner that should CT Page 12341 be taken into consideration. The possibility of its use for all purposes, present and prospective, for which it is adapted and to which it might in reason be applied, must be considered. 4 Nichols, Eminent Domain, (3d Ed.) Section 12B. 12. "The ultimate goal of the limitations placed upon establishing a higher and better use of the land (thus raising the ultimate value of the land being taken) is to avoid mere speculation or conjecture, and uncertainty. The potential use value must be reasonable, and within the realm of possibility in the not too distant future. The property must be available for the potential use asserted, and adaptable for the particular purpose. . . . Proof of actual, reasonable or intrinsic value of the property may be shown by the value of its uses, its particular fitness for such uses, and its adaptability for any other uses or purposes, and the reasonable value thereof." 4 Nichols, Eminent Domain (3d Ed.) Section 12B. 14.
In order to fix this fair market value, it is the referee's duty to consider all the factors, circumstances and opinions expressed by the witnesses before him that would tend to affect the worth of the property taken. One factor is the so-called highest and best use of the property or its most advantageous use. The "highest and best use" concept, chiefly employed as a starting point in estimating the value of real estate, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of property. Connecticut Printers, Inc. v.Redevelopment Agency, 159 Conn. 407, 410-11. Implied in this definition is that "the determination of highest and best use takes into account the contribution of a specific use to the community and community development goals as well as the benefits of that use to individual property owners. Hence, in certain situations the highest and best use of land may be for parks, greenbelts, preservation, conservation, wildlife habitat, and the like." 9 Nichols, Eminent Domain, (3d Ed.) App. B-2(h)-20.
In Gray Line Bus Co. v. Greater Bridgeport Transit District,188 Conn. 417, the condemnor appealed from the court's award claiming error in the valuation of two components thereof; the real estate and the intangibles. The only complaint made of the valuation of the real estate arrived at by the trier pertained to the referee's conclusion that the unique suitability of the site for special use as a bus terminal increased the value of the property. "The fair market value of a piece of real property should be determined in the light of the use to which it is being CT Page 12342 put or the use to which it could be put most advantageously.Housing Authority v. Lustig, 139 Conn. 73, 76, 90 A.2d 169
(1952). All parties agreed that the best use of the property on Dover Street was its present use as a bus garage. . . . There was evidence that the plaintiff's property was especially desirable for the operation of a bus terminal and that property of similar utility for this purpose would be very difficult to find in the Bridgeport area. We conclude that the referee did not err in considering this factor to enhance the value of the real estate in arriving at his valuation." Id., 420.
The principal claim of error was directed against the combined allowance for the franchises and other intangibles included in the taking. As to the franchise or opportunity to operate the plaintiff's bus lines, the court found no economic worth. That precluded any award for its taking. Id., 428. The court, however, perceived a substantial difference between the franchise and the other elements of the award for intangible property. "Although benefit to the taker may not be the measure of damages in a condemnation proceeding, it is not wholly irrelevant in deciding whether the taking of a particular form of property merits some award. The basic principle that property may not be taken without just compensation is offended where a public authority is permitted to receive a windfall of substantial value without some recognition of the interest of the owners in the form of a reasonable award." Id., 429-30. "It is not unheard of for an owner to be faced with a situation where his property, worthless to himself and to others who are not in a position to utilize it in some worthwhile fashion, has substantial value to only one person." Id., 430.
The court found error in the combined award for the franchises and other intangible assets because we "cannot ascertain the amount of the allowance for the other intangibles or which of the elements claimed to have benefited the defendant entered into the calculation made by the referee. A new trial of the issues related to this part of the award is, therefore, necessary." Id., 431.
"The loss to the owner, in the usual case, is fair market value, but such is not always the case because the question of what is just compensation is equitable not legal. . . . The proper measure of damages is that amount of money that will put the landowner in as good a position in a pecuniary sense as he would have been in had the property not been taken. . . . A trier CT Page 12343 may select the method of valuation most appropriate to the facts of the case in valuing a land interest. . . The trier need not calculate damages with mathematical precision but may approximate damages . . . . Whether the measure of damages in this unique fact situation is the loss to the plaintiff . . . or is the gain to the defendant, . . . the dollar amount of just compensation would be the same and was correctly established by the trial court." Citino v. Redevelopment Agency, 51 Conn. App. 262,283-85.
A condemnation of real estate 100 years ago, when railroads provided the principal means of travel, is significantly comparable to the proceeding here. Orleans J. Ry. Co. v.Jefferson L. P. Ry. Co., 51 La. Ann. 1605, 26 So. 278 (1899), reviewed in 2 Orgel, Valuation under Eminent Domain (2d Ed.) Section 92, pp. 398-400. In that case the plaintiff company sought to condemn a roadbed through swampy land. This roadbed was part of a right of way owned by the defendant company. Over the eastern portion of the right of way, the defendant had operated a railroad which it had discontinued long before the commencement of the proceeding. Subsequent to the defendant's cessation of operation, the city of New Orleans had dug a canal through the right of way and had deposited the excavated earth on the westerly portion in such a manner as to create a well-settled roadbed. It was this portion of the right of way that the plaintiff sought to condemn.
The court found that the defendant was a substantially defunct corporation and that there was no probability of its ever utilizing the right of way for railroad purposes. The court held that the defendant was entitled to have the special adaptability for railroad purposes taken into consideration and increased the award substantially, saying at 26 So. 278, 284: "We are not called on to attempt any definition of the word `value,' or to say of what elements it is composed; but we think that while present, active demand affects value, it is not of its essence, and that there is such a thing as an absolute, intrinsic value to property, independent of offers to purchase, and that value includes in it at all times the possibilities of the future. . . . So far from the building of the road giving value to the land, it is the special condition, situation, and value of the strip which is the real reason d'etre of the building of the road. There is great reason for doubt whether the road would be built at all, but for the existence of this strip, ready prepared, as it were, for a roadbed." CT Page 12344
The special adaptability of the land for the purpose of the taking may be considered by the court, as an informed prospective buyer would take such element into consideration in fixing the price he would be willing to pay for the land. Orgel, supra, 390-91, citing Oregon R. Nav. Co. v. Taffe, 67 Or. 102,134 P. 1024 (1913), where the court, at 134 P. 1024, 1028, stated: "There is a recognized difference between estimating damages by the value of the property to the person or corporation exercising the right of condemnation and considering the availability or adaptability of a piece of land for the purpose for which it is condemned as an element of value which would attract any buyer for that purpose. The true rule is that any use for which the property is capable may be considered, and if the land has an adaptability for the purposes for which it is taken, the owner may have this considered in the estimate as well as any other use for which it is capable. This, we understand, is the correct rule.
The court finds that the highest and best use of the subject properties is their use in the manner proposed by the takings for the relocation and realignment of Powder Mill Road and the replacement of its unsafe and abandoned bridge, or a similar use bridging the Nepaug River, utilizing the existing abutments on its banks, and building a roadway for transportation or recreational purposes over and incorporating the abandoned railroad trackbed existing on the properties. There is a special adaptability of the subject premises for such highest and best use. As was so aptly stated by the Louisiana court a century ago in Orleans J. Ry. Co. v. Jefferson L. P. Ry. Co., supra, 284, "[t]here is great reason for doubt whether the road [and bridge] would be built at all, but for the existence of [these] strip[s], ready prepared, as it were, for a [bridge and] roadbed."
A judge trial referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all circumstances, the evidence, his general knowledge and his viewing of the premises. Minicucci v.Commissioner of Transportation, 211 Conn. 383, 388 (1989);Birnbaum v. Ives, 163 Conn. 12, 21-22 (1972); Feigenbaum v.Waterbury, 20 Conn. App. 148, 153 (1989). It is his task to reach a result that gives the plaintiff, as nearly as possible, a fair equivalent in money as just compensation for the property taken. CT Page 12345Mathis v. Redevelopment Agency, 165 Conn. 622, 623 (1973);Feigenbaum v. Waterbury, supra, 153-54.
In the performance of this duty, based upon all the circumstances, consideration of the evidence, general knowledge of the elements constituting value, and a viewing of the property and surrounding area, in Docket No. 579139 I find the value of the subject property taken to be $22,300; and in Docket No. 579140 I find the value of the subject property taken to be $24,100. No severance damage to remaining property is assessed. The condemnation of the Towpath property was a total taking. In the Wilusz condemnation, there is no finding of damage to the remaining property. See Hollister v. Cox, 131 Conn. 523, 527; 5 Nichols, Eminent Domain (3d Ed.) Section 16.04.
In Docket No. 579139, judgment may enter for the appellant in the amount of $22,300, less $1,175 previously paid, or a net of $21,125, with interest on such excess at the rate of 8% per annum, together with costs and a reasonable appraisal fee of $500.
In Docket No. 579140, judgment may enter for the appellant in the amount of $24,100, including the amount of $1,575 on deposit with the clerk of the court, hereby ordered paid, with interest on the excess over the deposit, being $22,525, at the rate of 8% per annum, together with costs and a reasonable appraisal fee of $500.
William C. Bieluch Judge Trial Referee